Judge Rosemary Ledet
[tIn this criminal appeal, Greenville Mahogany appeals his convictions for attempted second degree murder, in violation of La. R.S. 14:27(30.1), and discharging a firearm during a violent crime, in violation of La. R.S. 14:94 F, and his sentences. For the reasons that follow, we affirm.
STATEMENT OF THE FACTS[1]
On December 19, 2011, at about 1:45 p.m., Mr. Brazile was shot in the hip while inside his vehicle on the corner of Mayo and Morrison Roads in New Orleans, Louisiana. The shooting was believed to be connected to an earlier November 2011 shooting, which Mr. Brazile had survived, and an October 2011 altercation. A brief summary of the October 2011 altercation and the November 2011 shooting is necessary to set the backdrop for the December 19, 2011, shooting at issue here.
Both the October 2011 altercation and the November 2011 shooting occurred at the Sports Café on Downman Road in New Orleans East. Both Mr. [2Brazile and Mr. Mahogany testified at trial that they were employed as promoters.[2] Each of them explained that they had an arrangement with the Sports Café, albeit on different days of the week, to use it as a venue for their promotions. Mr. Brazile’s day was Saturday; Mr. Mahogany’s day was Friday. On those days, they each used the Sports Café as a venue for a regular event in exchange for a take of the admissions at the door. Mr. Brazile testified that he was the chief executive officer of Life and Death Record Company and that his job included acting as a promoter staging music concerts. On Saturday nights, he used the Sports Café as the venue for his music concerts. Mr. Mahogany testified that he too was a promoter and that he used the Sports Café on Friday nights for his party nights for his group, Blowing Money Fast (“BMF”). Mr. Mahogany denied any rivalry between his and Mr. Bazile’s promotions.
Both Mr. Brazile and Mr. Mahogany were at the Sports Café on the night of October 9, 2011. Mr. Brazile had an event there that night. At about midnight, Mr. *495 Brazile saw his god-brother—Rashad Hall—and another man—later identified as Mr. Baham—engaged in a verbal altercation. Mr. Hall told Mr. Brazile that he did not know Mr. Baham. According to Mr. Brazile, Mr. Baham then joined a group of about six to eight men. Mr. Ba-ham’s group then gathered together in a “huddle.” Mr. Brazile recognized Mr. Mahogany as one of the men in that huddle. Thereafter, Mr. Baham approached Mr. Brazile and told him “it’s going down |swhen I leave out the club.” Fearing that Mr. Baham would attack him after he left the Sports Café, Mr. Brazile hit Mr. Ba-ham in the face while exiting the Sports Café and then ran. Mr. Brazile encountered the police in the parking lot and explained to them that he was threatened by someone in the Sports Café; the police advised Mr. Brazile to leave the area.
On November 20, 2011, Mr. Brazile and Mr. Mahogany again were both at the Sports Café. Mr. Brazile had another event there that night. At about 2:30 a.m., Mr. Brazile first noticed Mr. Mahogany, who Mr. Brazile recognized as Mr. Ba-ham’s associate, and another man walk through the club. Mr. Brazile explained that he thought it was unusual that they were there so late since he had not seen them there earlier. Because he was uncomfortable in Mr. Mahogany’s presence, Mr. Brazile told his friends that it was time to leave. When he walked to his ear in the parking lot, Mr. Brazile spotted Mr. Mahogany leaning on the vehicle parked in front of his car. As Mr. Brazile fumbled for his keys in his pockets, he heard a noise come from the area where Mr. Mahogany was located. Mr. Brazile then saw Mr. Baham appear through the fog, running towards him holding a gun. As Mr. Brazile turned and ran, he heard gun shots and discovered that he was wounded in his side and back. Mr. Brazile then went to a service station on Dwyer and Downman Road, where he collapsed. He spent four days in a hospital.
After Mr. Brazile was released from the hospital, he conducted internet research on Facebook as to the identity of Mr. Ba-ham’s group—the BMF. Mr. Brazile explained that he saw pictures of Mr. Baham on the website; he memorized |4some of the names, but not the faces, of some of the people in Mr. Baham’s photographs. He testified that he provided that information to the police.[3]
Again, the crime at issue here is the shooting that occurred on December 19, 2011. Between 12:00 p.m. and 1:00 p.m. that day, Mr. Brazile left his girlfriend’s residence on Mayo Street to go to McDonald’s to get food for his children. On his way back home, he stopped to speak with his friend, “Josh,” in the parking lot of a mechanic shop on the 1-10 Service Road and Morrison Avenue. While talking to Josh, Mr. Brazile noticed a white Dodge Charger enter the parking lot and drive past them. There were two men in the Charger. He testified that the driver, later identified as Mr. Williams, looked out the window at him with a menacing look, like “he’s still alive.” At that point, he did not see the passenger. The Charger stopped at the opposite end of the parking lot and waited. Because he felt that the men in the Charger had something to do with the November 2011 shooting, Mr. Brazile told Josh that he had to leave. Mr. Brazile got into his car and drove out of the parking lot. As he pulled out, he saw a blue Explorer with four passengers pull into the lot. According to Mr. Brazile, he recognized *496 Mr. Baham as a passenger in the-Explorer.
When he left the parking lot, Mr. Bra-zile noticed that the men in the Charger were following him down the service road. Mr. Brazile turned onto Mayo Road. As he turned a corner near Morrison and Mayo, a grass cutting truck was blocking the street. Mr. Brazile was unable to maneuver around the truck; his passage was blocked. At that point, the Charger pulled parallel to Mr. Brazile’s vehicle; and the | (¡passenger, later identified as Mr. Mahogany, fired shots at Mr. Brazile. Mr. Brazile testified that he ducked and began alternatively “hitting the gas, hitting the brakes” until the Charger passed his vehicle. The men in the Charger then sped from the scene. Mr. Brazile drove a short distance to His girlfriend’s residence, and his girlfriend called 911. Mr. Brazile was taken to the hospital by ambulance.
..Mr. Brazile’s hospital stay lasted about four hours; his injury did not require, any surgical repair. During his hospital stay, two NOPD officers testified that they interviewed Mr. Brazile—Detective Borjius Guient, the lead investigating officer, and Officer Donald Blackwell, the initial investigating officer.[4]
Officer Blackwell explained that his involvement in this case consisted solely of speaking with Mr. Brazile at the hospital on the date of the shooting. Officer Blackwell described Mr. Brazile as cognizant and lucid. Officer Blackwell summarized Mr. Brazile’s statement to him of what happened as follows:.
Basically, he told me he was standing outside of Gabby’s with a friend. They saw a white vehicle pull up. I believe it was a Dodge Charger pull up. Once the car pulled up, the friend asked was that Greenie, the person, who shot him in the past. He said yes. A short time later Mr. Brazile walked away, got into his vehicle, Sometime after that, the white Charger started to follow. Greenie pulls on side. The friend that was in the car with Greenie was Junior, I believe, and he started opening fire on him.
Officer Blackwell further testified that Mr. Brazile denied having returned fire' or shots at the Charger.
Detective Guient testified that he too interviewed Mr. Brazile at the hospital on the day of the shooting. Mr. Brazile told him that he got a good look at the driver and the passenger in the Charger and provided him with the two occupants’ | ^nicknames—Greenie and Ace or Junior. (Ace and Junior were nicknames for the same person.). Officer Guient, however, acknowledged that Mri Brazile changed his account of the shooting several times.[5]
Both Detective Guient and Mr. Brazile consistently testified regarding Mr. Brazile locating a photograph of the person he identified as the shooter on Facebook a few hours after the shooting. =Mr. Brazile explained that after returning home from the hospital, he went onto Facebook and looked through the pictures of Mr. Baham and the BMF group. He located a picture of Mr. Mahogany “in the same- actual car *497 that they came and shot [him] in” only hours earlier. Mr.- Brazile telephoned Detective Guient and related to him that he had found this photograph on Facebook of “the person who actually fired the gun earlier that day at [him].” Officer Guient likewise testified that he too went on Face-book, located the photograph, and confirmed with Mr. Brazile that the photograph that he was viewing was the same one that Mr. Brazile was viewing. Officer Guient then downloaded the photograph and met with Mr. Brazile, who signed the photograph on January 4, 2013, identifying the photograph as depicting the shooter.[6]
[ 7Although Officer Guient also compiled a six-person photograph lineup containing Mr. Mahogany’s photograph, he had difficulty locating Mr. Brazile. At that point, Mr. Brazile had gone into hiding out of fear. Eventually, Officer Guient was able to locate him. On January .24, 2013, they met and Mr. Brazile selected Mr. Mahogany’s photograph from the lineup. Mr. Bra-zile also signed a second downloaded photograph on that date.
Officer Guient testified that the Charger was found within a day of the shooting and that the police determined that it had been stolen before the shooting. There was no evidence inside the Charger linking either Mr. Williams or Mr. Mahogany to the shooting. The Charger, however, had two bullet holes located on the rear side of it. The police found spent shell casings at the scene and inside the Charger. During the investigation, a weapon was recovered; however, it was unrelated to this shooting.
Mr. Mahogany testified in his own defense and provided an alibi witness, Gaid-relle Chamberlain. He denied shooting Mr. Brazile- Indeed, he denied knowing Mr. Brazile or having any disputes with him or his friends. Mr. Mahogany also denied telling his cell mate, Mr. Murthil, that he attempted to.kill Mr. Brazile. Although Mr. Mahogany acknowledged that he witnessed Mr. Brazile hit Mr. Baham with a beer bottle at the Sports Café in October 2011, he denied knowing what the problem was between Mr. Brazile and Mr, Baham or interjecting himself into their dispute. Finally, he corroborated Ms, Chamberlain’s testimony regarding his alibi.
Ms. Chamberlain testified that Mr. Mahogany was her best 'friend; however, she denied that he was her boyfriend. On the day of the shooting, she testified that she went to get Mr. Mahogany from his house at about 10:30 a.m. Around noon, |sMr. Mahogany helped her cut the grass at her mother’s house on West Laverne Street in New Orleans. They finished cutting the grass about an hour later and remained together until 2:00 or 3:00 a.m. the following morning. She testified that Mr. Mahogany did not leave her company the entire day.
*498 Ms. Chamberlain further testified that she was with Mr. Mahogany when he was arrested. At that time, they were en route to visit Mr. Mahogany’s friend, Mr. Ba-ham. When they arrived at Mr. Baham’s apartment, the police were parked in the driveway. Mr. Mahogany exited the ear and called Mr. Baham’s name. When Mr. Baham saw Mr. Mahogany, he ran with two officers in pursuit. One of the officers, who originally chased Mr. Baham, returned to where Mr. Mahogany and Ms. Chamberlain were located and told them not to leave the area. Ultimately, the officer ran their names and discovered that Mr. Mahogany was wanted by the police.
Following his arrest, Mr. Mahogany coincidentally shared a cell in Orleans Parish Prison (“OPP”) with Mr. Brazile’s best friend, David Murthil.[7] They were cell mates for about two months—from January to February 2012. Testifying at trial for the State, Mr. Murthil explained that he was Mr. Brazile’s lifelong friend and that he had never met Mr. Mahogany before they became cell mates. Mr. Murthil displayed the tattoo on his neck, which said “East Beast,” indicating that he was from New Orleans East. Mr. Murthil further explained that Mr. Mahogany, based on the tattoo, asked him if he was from New Orleans East and if he knew “Spoo-ney”—the nickname Mr. Mahogany attributed to Mr. Brazile.[8] When Mr. |flMurthiI denied knowing Spooney, Mr. Mahogany related to him a story about an incident involving Spooney.
According to Mr. Murthil, Mr. Mahogany told him the following story. First, Mr. Mahogany related that he was at the Sports Café when Spooney hit Mr. Baham with a beer bottle. Continuing, Mr. Mahogany told him that on another night after that altercation, as Spooney drove up to the Sports Café, Mr. Mahogany distracted Spooney while Mr. Baham shot Spooney. Specifically, Mr. Mahogany told him that “he took Spooney’s attention while Chris [Baham] hid in the fog and jumped out the fog while he was talking to Spooney and starting shooting Spooney up.” Finally, Mr. Mahogany related that Mr. Baham failed to finish the job—kill Spooney—but he heard “Spooney had some money out on his head, so him [Mahogany] and his pod-ner Rayne [Williams] caught Spooney on Morrison and Mayo and shot him up.” According to Mr. Murthil, Mr. Mahogany told him this story at least twice while they were cell mates.
While Mr. Murthil and Mr. Mahogany were still cell mates, Mr. Murthil told Mr. Brazile, in a jail house call, the story that Mr. Mahogany had related to him. Eventually, Mr. Mahogany learned that Mr. Murthil knew Mr. Brazile as Scoonie not Spooney. Indeed, one day, while Mr. Murthil was on the phone with Mr. Brazile in a common area in the jail, Mr. Murthil asked Mr. Mahogany if he wanted to talk to Mr. Brazile. Mr. Mahogany said no, but to tell Mr. Brazile: “I didn’t do it.” Moreover, after Mr. Mahogany learned of Mr. Murthil’s relationship with Mr. Brazile, he backtracked from his story (confession that he shot Mr. Brazil). Mr. Mahogany explained to Mr. Murthil that the story he told him was not true and that it was simply what the prosecution was alleging. During cross-examination, Mr. Murthil testified that Mr. Brazile told him that he returned shots with his own gun during the December 19,2011, shooting.[9]
*499 STATEMENT OF THE CASE
On May 17, 2012, the State charged Mr. Mahogany and a co-defendant, Rayne Williams, with the December 19, 2011, attempted second degree murder of Winfield Brazile, III. The State also charged Mr. Mahogany with discharging a firearm during a crime of violence. Another co-defendant, Christopher Baham, was charged with the November 20, 2011, attempted murder of Mr. Brazile.
At his arraignment on May 25, 2012, Mr. Mahogany pled not guilty. Also at his arraignment, Mr. Mahogany was informed of his right to a jury trial. On January 24, 2013, the district court found no probable cause to hold Mr. Mahogany for trial. The State’s writ application seeking review of this ruling was denied by both this court[10] and the Louisiana Supreme Court.[11]
On June 17, 2013, a joint bench trial began on the charges against Mr. Mahogany and Mr. Williams. During trial, an issue arose regarding jail house phone calls made by Mr. Mahogany’s cell mate, Mr. Murthil, to the victim, Mr. Brazile. To allow time for the defense to obtain the recordings of these jail house Inphone calls, the trial was recessed. On February 21, 2014, the trial resumed and was completed. The district court found both defendants guilty as charged.[12]
On June 3, 2014, the district court sentenced Mr. Mahogany on count one (attempted second degree murder) to twenty years and on count two (illegal discharge of a weapon) to ten years. Both sentences were imposed without benefit of parole, probation, or suspension of sentence; and with benefit for time served. The sentences were ordered to be served concurrently. At the sentencing hearing, the State filed a habitual offender bill against Mr. Mahogany. On October 29, 2014, Mr. Mahogany filed a Motion to Quash the Multiple Bill of Information. In February 2015, Mr. Mahogany filed a notice of appeal, which was granted.
On September 9, 2015, the district court permitted Mr. Mahogany to file out-of-time motions for new trial and post-verdict judgment of acquittal. On that same date, Mr. Mahogany filed a Motion to Reconsider Sentence.[13] On that same day, the district court denied all three of those motions.
On January 20, 2016, the multiple bill hearing was held. Although the State charged Mr. Mahogany as a third offender, the district court adjudicated him a second offender. The district court vacated *500 the original sentences and resentenced Mr. Mahogany to twenty-five years as to count one (attempted second degree murder) and fifteen years as to count two (discharging a firearm during a crime of violence); the district court ordered the sentences to be served concurrently.
lii>On March 16, 2016, this court rendered its decision on Mr. Mahogany’s original appeal, State v. Mahogany, 15-0818 (La. App. 4 Cir. 3/16/16), 191 So.3d 615. In his original appeal, Mr. Mahogany appealed his convictions and original sentences and asserted the following four assignments of, errors: “(1) the absence of evidence of his knowing and voluntary waiver of his right to a jury trial; (2) the convictions violated the prohibition against double jeopardy; (3) the evidence is insufficient to support his convictions; and, (4) the sentences imposed are unconstitutionally excessive.” Mahogany, 15-0818 at p. 1, 191 So.3d at 616.
Finding two errors patent, this court remanded for an evidentiary hearing on one of those errors—the jury waiver issue;[14] reserved Mr. Mahogany’s right to appeal any ruling; and pretermitted the remaining issues as well as a discussion of 11sthe facts. In so doing, we ordered that “[t]he matter is remanded for án evidentia-ry hearing to determine whether Mr. Mahogany knowingly and intelligently waived his right to trial by jury.” Mahogany, 15-0818 at p. 8, 191 So.3d at 620 (citing State v. Nanlal, 97-0786 (La. 9/26/97), 701 So.2d 963).[15]
On April 26, 2016, the district court conducted the evidentiary hearing on the jury waiver issue. On May 24, 2016, the district court found that Mr. Mahogany knowingly and intelligently waived his right to a jury trial. Thereafter, the parties filed supplemental briefs in this court. This court, however, found that it lacked jurisdiction to consider Mr. Mahogany’s supplemental assignments of error arising from the district court’s ruling on remand and the issues pretermitted on appeal. This court *501 thus ordered the lodging of a new appeal. The instant appeal followed.
DISCUSSION
I uErrors Patent
A review of the record for errors patent reveals one. When the district court sentenced Mr. Mahogany as a double felony offender, it failed to restrict the sentences as to probation and suspension of sentence. See La. R.S. 15:529.1 G. 'Despite this omission, however, pursuant to La. R.S. 15:301.1(A) and State v. Williams, 2000-1725 (La. 11/28/01), 800 So.2d 790, the sentence is deemed to have been imposed with the restrictions of benefits.” State v. Jones, 15-0839, p. 2 (La. App. 4 Cir. 12/30/15), 184 So.3d 822, 824. Thus, this Court need not take any action to cure this error patent.

Third assignment of error

In his third assignment of error, Mr. Mahogany contends that “the State failed to prove identity beyond a reasonable doubt and further failed to prove the crime of attempted second degree murder beyond a reasonable doubt; at best, the evidence proves a second degree battery.” This assignment of error raises a two-part sufficiency of the evidence claim. We consider this assignment of error first given the well-settled jurisprudential rule is that “ ‘[w]hen issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.’ ” State v. Miner, 14-0939, p. 5 (La. App. 4 Cir. 3/11/15), 163 So.3d 132, 135 (quoting State v. Hearold, 603 So.2d 731, 734 (La. 1992)).
The standard for reviewing a sufficiency of the evidence claim is set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which provides that “the relevant question is whether, after viewing the evidence, in the light most favorable to the prosecution,' any rational trier of fact'could have found the essential elements of the crime beyond a reasonable doubt.” 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis ,in original). If rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305, 1311 (La. 1988). This standard thus “preserves, the role of the jury as the factfinder in the case but it does not allow jurors 'to. speculate if the evidence-is such that reasonable jurors must have a reasonable doubt.’” State v. Pierre, 93-0893, p. 5 (La. 2/3/94), 631 So.2d 427, 429 (quoting Mussall, supra) (quoting 2 C. Wright, FEDERAL PRACTICE & PROCEDURE, CRIMINAL 2d, § 467 (2d ed. 1982)); see also State v. Macon, 06-481, p. 8 (La. 6/1/07), 957 So.2d 1280, 1285 (holding that “[a] reviewing court may impinge on the fact-finding function of the jury only to the extent necessary to assure the. Jackson standard of review.”).
In State v. Jones, 15-0956, pp. 5-6 (La. App. 4 Cir. 3/22/17), 214 So.3d 124, 133, this court enumerated the following key principles governing a sufficiency of the evidence review:
First, we examine all the evidence considered by the jury, including evidence which may have been erroneously admitted. See [State v.] Hearold, 603 So.2d [731,] 734 [ (La. 1992) ]. Second, all the evidence is viewed in the light most favorable to the prosecution. See, Jackson, 443 U.S. at 319, 99 S.Ct. 2781; State v. Clements, 15-0630, p. 7 (La. App. 4 Cir. 5/4/16), 194 So.3d 712, 717. Thus, we may consider all reasonable inferences from the evidence which the factfinder could have made. See [I]d.
Finally, as a reviewing court, we are highly deferential to the findings of the *502 trier of fact. See Jackson, 443 U.S. at 319, 99 S.Ct. 2781; State v. Armstead, 14-0036, p. 11 (La. App. 4 Cir. 1/28/15), 159 So.3d 502, 512. A jury may accept as true the testimony of any witness, even a single witness, and find such testimony sufficient to establish each essential element beyond a reasonable doubt. See Clements, at p. 7, 194 So.3d at 717. And, we will only tread on a jury’s presumed acceptance of a witness’s testimony when that testimony is implausible or clearly contrary to the evidence. See State v. Mussall, 523 So.2d 1305, 1311 (La. 1988); Armstead, at p. 12, 159 So.3d at 512.
When, as in this case, the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is also required to negate any reasonable probability of mis-identification in order to satisfy its burden under Jackson. State v. Green, 16-0793, pp. 6-7 (La. App. 4 Cir. 5/3/17), 220 So.3d 103, 105-06, 2017 WL 1716189 at *3.
Mr. Mahogany was convicted of attempted second degree murder. Second degree murder is defined as including the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. 11fiR.S. 14:30.1 A(l). The two essential elements of the crime of attempted second degree murder the State must prove are as follows: (i) the specific intent to kill the victim; and (ii) the commission of an overt act that tends toward the accomplishment of the victim’s death. See State v. Jones, 12-0891, p. 21 (La. App. 4 Cir. 8/7/13), 122 So.3d 1065, 1077 (citing State v. Johnson, 08-1488, p. 9 (La. App. 4 Cir. 2/10/10), 33 So.3d 328, 334; and La. R.S. 14:27(14:30.1)); see also State v. Dove, 15-0783, p. 23 (La. App. 4 Cir. 5/4/16), 194 So.3d 92, 109.[16]
As noted earlier, Mr. Mahogany’s sufficiency claim has two parts. First, he contends that the State failed to prove he intended to kill Mr. Brazile. Second, he contends that the State failed to prove he was correctly identified beyond a reasonable doubt. We separately address each part.
The first part of his claim relates to specific intent to kill. Specific intent exists “when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent is a question of fact. State v. Durand, 07-4, p. 9 (La. App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034. Although specific intent is a question of fact, it may be inferred from the circumstances and the defendant’s actions. See State v. Seals, 95-0305, p. 6 (La. 11/25/96), 684 So.2d 368, 373-74 (noting that |17“[o]n more than one occasion, this Court has held that specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person.).
Pointing and firing a gun at a person is a circumstance from which an infer *503 ence can be drawn that a defendant possessed specific intent to kill; nonetheless, the circumstances surrounding that act, including the distance from the firearm to the victim and the number of shots fired, must also be considered. State v. Cooks, 11-0342, p. 17 (La. App. 4 Cir. 12/14/11), 81 So.3d 932, 942; see also State v. Bernard, 14-0580, p. 12 (La. App. 4 Cir. 6/3/15), 171 So.3d 1063, 1073, writ denied, 15-1322 (La. 6/17/16), 192 So.3d 776, cert. denied, — U.S.-, 137 S.Ct. 387, 196 L.Ed.2d 305 (2016) (citing State v. Hoffman, 98-3118, p. 48 (La. 4/11/00), 768 So.2d 542, 585) (holding that “[a] defendant’s act of aiming a lethal weapon and discharging it in the direction of his victims supports a finding by the trier of fact that the defendant acted with specific intent to kill.”).
As noted, Mr. Mahogany contends that the evidence presented at trial was insufficient to support a finding that he had the specific intent to kill Mr. Brazile. In support, he notes that on the day of the December 2011 shooting, Mr. Brazile was treated and released from the hospital in four hours for a non-life threatening injury to his left hip. He thus contends that the evidence presented proves only an aggravated battery or second degree battery. La. R.S. 14:34.1 (providing that “[sjecond degree battery is a battery when the offender intentionally inflicts serious bodily injury.”).
Countering, the State contends that the evidence shows that Mr. Mahogany: “(1) was involved in an altercation with the victim prior to the charged offense, (2) rode in a vehicle driven by his friend, Defendant Williams, who followed the victim, (3) exited Defendant Williams’ vehicle once the victim was trapped in his hRown car and fired at the victim multiple times, striking him, and (4) confessed to a fellow inmate.” The State contends that Mr. Mahogany’s arguments concern the victim’s credibility, a matter which cannot be second-guessed by this court.
“The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence.” State v. Richards, 11-0349, p. 9 (La. App. 4 Cir. 12/1/11), 78 So.3d 864, 869 (citing State v. Vessell, 450 So.2d 938, 943 (La. 1984)). “Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’ testimony, if believed by the fact finder, is sufficient to support a factual conclusion.” State v. Rapp, 14-0633, pp. 6-7 (La. App. 4 Cir. 2/18/15), 161 So.3d 103, 108 (citing State v. Marshall, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369).
“It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence.” Richards, supra (citing State v. Cummings, 668 So.2d 1132 (La. 1996); State v. Rosiere, 488 So.2d 965, 968 (La. 1986)). Conflicting statements as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244, 1249 (La. App. 4th Cir. 1989). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id.
Viewing the evidence in this case in the light most favorable to the State, we find it was not unreasonable for the trier or fact—here, the trial judge—to conclude that Mr. Mahogany shot Mr. Brazile with the specific intent to kill or to inflict great bodily harm on him. Detective Guient testified that he met with the victim, Mr. Brazile, at the hospital immediately after the shooting. At that time, the victim was unwavering in telling Detective Guient that he was shot by Mr. Mahogany, 11saIso known as “Greenie.” The victim located a picture of Mr. Mahogany on Facebook and *504 submitted it to Detective Guient as identification of the man who shot him. Moreover, about one month after the shooting, the victim identified Mr. Mahogany as the shooter from a six-photo lineup compiled by Detective Guient. Forensic evidence in the case showed that multiple bullet casings were found at the crime scene, and at least one bullet was recovered from the grill of the victim’s vehicle.
Mr. Brazile testified that he saw Mr. Mahogany at the Sports Café in October 2011 and that he recognized Mr. Mahogany because he was standing in a huddle with Mr. Baham’s friends that, night. Likewise, he testified that he saw Mr. Mahogany at the Sports Café in November 2011 when he was shot. On the. date of the shooting in question, December 19, 201Í, Mr. Brazile testified that he saw Mr., Mahogany in the passenger seat of the white Charger reach out of the window and open fire upon him, striking him at least once. Lastly, Mr. Murthil, Mr. Mahogany’s cell mate for two months at OPP, testified that Mr. Mahogany bragged to him that he had shot Mr. Brazile, telling him the story at least twice. Again, viewing the evidence in this case in favor of the State, it was not unreasonable for the trier of fact to conclude that Mr. Mahogany was the shooter and that he had the specific intent to kill the victim, Mr. Brazile, by intentionally discharging a weapon during the commission of an act of violence.
The other component of Mr. Mahogany’s sufficiency of evidence claim is his argument that the State failed- to establish that it was more probable than not that he was the perpetrator of the offenses. When the challenge is to the defendant’s identity as the perpetrator, the prosecution is required to negate any reasonable probability of misidentification. State v. Pierce, 12-0879, p. 4 (La. App. 4 Cir. 12/10/13), 131 So.3d. 136, 140; State v. Galle, 11-0930, p. 31 (La. App. 4 Cir. 2/13/13), 107 So.3d 916, 935; State v. Everett, 11-0714, p. 15 (La. App. 4 Cir. 6/13/12), 96 So.3d 605, 619.
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court enumerated a fiVe-factor test for courts to consider in determining, based on the totality of the circumstances, whether a suggestive identification procedure presented a substantial likelihood of misidentification. The five Manson factors are as follows: (1) the witness’s opportunity to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of his prior description of‘the criminal; (4) the level' of certainty demonstrated at the confrontation; and (5) the time between the crime and the .confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2253.
Although Mr. Mahogany does not suggest that the State employed a suggestive identification procedure, this court has applied the Manson test in this context. Stated otherwise, the Manson test has been employed -to assist in assessing the reliability of eyewitness identifications when reviewing the sufficiency of the evidence to determine if the State satisfied its burden of negating any reasonable probability of misidentification. See State v. Santos-Castro, 12-0568, p. 22 (La. App. 4 Cir. 7/31/13), 120 So.3d 933, 946-47, writ denied, 13-2151 (La. 6/5/15), 171 So.3d 940 (citing State v. Lewis, 11-0999, pp. 6-9 (La. App, 4 Cir. 5/23/12), 95 So.3d 533, 537-38) (noting that “this Court employs the five Manson factors to assess the reliability of eyewitness identifications when reviewing the sufficiency of the evidence insofar as the State’s burden to negate any reasonable probability of misidentification when a defendant disputes identity.”).
| p.i The record reflects that Mr. Brazile had a good opportunity to view Mr. Ma *505 hogany at the time of the shooting, which occurred as Mr. Brazile sat in the drivers seat of his car and Mr. Mahogany sat in the front passenger seat of the Charger parked parallel to Mr. Brazile’s car. Air though Mr. Brazile ducked down in an attempt to avoid the shots, no evidence exists to suggest that he was not being attentive. In addition, he had seen Mr. Mahogany in both October and November 2011 during the two prior incidents at the Sports Café, Within hours of the shooting in question, Mr. Brazile located a photon graph of Mr.' Mahogany on the Internet (Pacebook), which he provided to the police. Mr. Mahogany also displayed no uncertainty when identifying Mr. Mahogany in the photographic lineup in January 2012, about one month after the shooting. He also positively identified Mr. Mahogany at trial.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Mr. Mahogany was the shooter. Thus, this assignment of error is unpersuasive.

First assignment of error

By this assignment, Mr, Mahogany contends that the “[t]he district court erred in finding that there was a valid waiver of the jury without requiring a written motion or conducting a contemporaneous colloquy on the record.” This same assignmént of error was raised in Mr. Mahogany’s earlier appeal. As noted earlier, following the suggested procedure noted in Nanlal, supra, we remanded to the district court for an evidentiary hearing. Mahogany, 15-0818 at pp. 3-4, 191 So.3d at 617.
laaOn May 24, 2016, after the evidentiary hearing, the district court orally provided the following reasons for its finding that Mr. Mahogany knowingly and voluntarily waived his right to a jury trial:
First of all, the court looked at and considered whether a colloquy was required for the waiver of a right to jury trial.. I’m looking at Louisiana jurisprudence. The court has determined that based on-that jurisprudence a colloquy is not required when a defendant waives his or her right to a trial by jury.
The second issue the court considered was the application of Louisiana Code of Criminal Procedure, Article 780, Sections A and B. The current codal article requires that any waiver of a right to trial by jury be in writing; however, at the time of the election of a trial by judge, the codal article in effect did not require that such waiver be in writing.
The court has determined from its review of the code, and the legislative intent that this article is not retroactive, and therefore, no waiver in writing was required or applied, to [the defendant’s] ease. And so, that waiver at that time was orally given as per the codal article in effect at that time.
And then, finally, the court has considered with all of that, whether [the defendant’s] waiver was knowing and intelligent, and based on the fact that the election of a trial by judge was placed on the record twice, in [the defendant’s] presence, and that we actually proceeded to trial with trial by judge, and then trial adjourned open for some time, due to the issues with the jail calls.
Then trial resumed again with just trial by judge, and defense counsel then noted that trial would be trial by judge, notwithstanding the testimony provided, the court finds that the jurisprudence supports that that was sufficient enough to constitute a knowing and intelligent waiver of a jury trial.
In his present appeal, Mr. Mahogany contends that the district court erred in characterizing this as a case of retroac *506 tive application of the amendment to La. C.Cr.P. art. 780 B,[17] which had an effective date of June 17, 2013. He emphasizes [ gjthat the date his trial commenced—June 17, 2013—coincided with the effective date of the amendment. Given the lack of compliance with the amended article, which mandates a signed waiver by the defendant and counsel in the record, Mr. Mahogany contends that his alleged waiver of his right to a jury trial must be presumed not to have been knowingly or voluntarily made.
Assuming, arguendo, that the amendment to La. C.Cr.P. art. 780 B applies here, the failure to comply with the statutory requirement of La. C.Cr.P. art. 780 B, as amended, does not establish that the oral waiver of Mr. Mahogany’s right to a jury trial denied him any constitutional right. Rather, this court has held that absent compliance with the amended article, “wé must consider the facts regarding the defendant’s waiver to determine whether the trial court’s error was harmless.” State v. Young, 16-0358, p. 10 (La. App. 4 Cir. 10/5/16), 203 So.3d 351, 358 (citing State v. Brandy, 16-0263, 15-1233 (La. App. 4 Cir. 8/24/16), 198 So.3d 1247 (Landrieu, J., concurring)). In conducting the harmless error analysis, the jurisprudence regarding the validity of oral waivers before the effective date of the amendment of Article 780 is instructive. Id.
“To be valid, a defendant’s waiver of his right to a jury trial must be knowing and intelligent.” State v. Bazile, 12-2243, p. 17 (La. 5/7/13), 144 So.3d 719, 733. “[A] criminal defendant’s jury waiver is deemed knowing and intelligent when he understands ‘that the choice confronting him is, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge.’” Id. The waiver of the right to a jury atrial cannot be presumed. State v. Biddy, 13-0356, p. 20 (La. App. 4 Cir. 11/20/13), 129 So.3d 768, 780.
Before the amendment, the preferred practice for obtaining a valid waiver of the right to a jury trial was for the trial court to advise the defendant personally on the record of his right to a jury trial and require him to waive the right personally, either in writing or by oral statement in open court on the record. State v. Miorana, 14-0362, p. 3 (La. App. 4 Cir. 12/17/14), 156 So.3d 1214, 1216. The Louisiana Supreme Court noted in State v. Pierre, 02-2665, p. 1 (La. 3/28/03), 842 So.2d 321, 322, that “[ajlthough it remains the preferred method for the district court to advise a defendant of her right to trial by jury in open court before obtaining a waiver, such a practice is not statutorily required.” Id. Instead, “ ‘[wjhether or not there is an intelligent, competent, self-protecting waiver of the right to trial by jury depends upon the unique circumstances of each case.’” Bazile, 12-2243, p. 17, 144 So.3d at 733 (quoting Adams v. U.S. ex rel. McCann, 317 U.S. 269, 278, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). When the trial judge does not follow the preferred method, an appellate court may nevertheless conduct a de novo review of the record to ascertain whether the defendant was advised of his or her right to jury trial; whether the defendant was present when his or her *507 counsel elected a judge (bench) trial; and, if he or she was present, whether he or she voiced any objection to the election. See State v. Denson, 11-0517, pp. 7-8 (La. App. 4 Cir. 1/25/12), 88 So.3d 1188, 1188-89; State v. Santee, 02-0693, p. 3 (La. App. 4 Cir. 12/4/02), 834 So.2d 533, 535.
At the April 26, 2016 evidentiary hearing to determine the knowing and voluntary nature of the waiver, the district court heard testimony from Mr. Mahogany and his trial counsel, Ike Spears. Mr. Spears testified that although he |2Sdid not remember all of the conversations he had with Mr. Mahogany concerning the waiver of the right to a jury trial, he recalled that Mr. Mahogany was encouraged by the district court’s failure to find probable cause at the preliminary hearing. Mr. Spears indicated that this fact motivated Mr. Mahogany’s choice of- a judge trial. Mr. Spears also recalled that he met several times with Mr. Mahogany before trial and that they discussed the fact Mr. Mahogany had chosen a judge trial. Mr. Spears specifically remembered that “it was definitely [Mr. Mahogany’s] election, as opposed to mine, because I rarely waive a jury.” Mr. Spears, however, did not recall whether there was any formal proceeding or colloquy in which the waiver was reflected on the record. Nonetheless, he testified that they advised the district court of Mr. Mahogany’s intention to waive the jury. Moreover, Mr. Spears testified that he believed Mr. Mahogany knew he had a right to a jury trial.
Mr. Mahogany testified that he was a high school graduate and that he had never gone to a jury trial. He denied having any conversations with Mr. Spears about whether he should elect a judge or jury trial. He also denied having any conversations with the trial judge about waiving his right to a jury trial. Furthermore, he denied ever telling Mr. Spears that he wanted a judge trial. Mr. Mahogany, however, admitted that he was aware that a jury is comprised of members of the public who come in and judge your casé; He also admitted that he pled guilty to two prior felonies and that he recalled that on the guilty plea forms he acknowledged waiving his right to a jury trial.
In sum, we cannot conclude that the district court erred in finding Mr. Mahogany knowingly and voluntarily waived his right to a jury trial given that he was present on two occasions when the district court was advised that the case would proceed to a bench trial; that his trial counsel (Mr. Spears) distinctly 12(iremembered discussing the issue with him; and that he himself, for strategic reasons (he believed the trial judge would be favorable to him), made the election of a bench trial. This assignment of error is not persuasive.

Second assignment of error

In his second assignment of error, Mr. Mahogany contends that “[t]he convictions for both attempted second degree murder and the intentional discharge o,f a firearm violated the prohibition against double jeopardy.” Mr. Mahogany does not dispute that the Blockburger test, discussed below, is not met; rather, he contends that the “same evidence test” was met. He contends that the same evidence—his shooting at Mr. Brazile with the intent to do him harm—was used to prove both offenses and that this violated double jeopardy. He thus contends that his conviction for intentional discharge of a firearm must be vacated.
Both the Fifth Amendment to the United States Constitution and Article 1, § 15 of the Louisiana Constitution guarantee that no person shall be twice placed in jeopardy for the same offense. See La. C.Cr.P. art. 591 (providing that “[n]o person shall be twice put in jeopardy of life or *508 liberty for the same offense”); see also La. C.Cr.P. art. 596.[18] Although La. C.Cr.P. art. 596 speaks of double jeopardy relative to a second prosecution, the double jeopardy prohibition also protects an accused from multiple -punishments for the same criminal conduct. State v. Gibson, 03-0647, p. 8 (La. App. 4 Cir. 2/4/04), 867 So.2d 793, 798-99; State v. Murray, 00 1258, p. 3 (La. 9/18/01), 799 So.2d 453, 454-55 (citing North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)) (holding that “[t]he Double Jeopardy Clauses of the federal and Louisiana constitutions not only prohibit successive trials for the same offense but also ‘protect [] against multiple punishments for the same offense.’”). This principle thus covers the situation presented here of a defendant charged, tried, convicted, and sentenced in one case for two offenses arising out of the same criminal conduct.
In State v. Magee, 11-0574, p. 75 (La. 9/28/12), 103 So.3d 285, 335, the Louisiana Supreme Court succinctly set forth; as follows, the two tests employed by Louisiana courts to determine whether a defendant’s right against double jeopardy has been violated:
When the same act or transaction constitutes a violation of two distinct statutory provisions, in assessing whether there are two offenses or only one, the Supreme Court uses the “additional fact” test Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Under this test, the provisions of each statute are analyzed to determine whether each requires proof of a fact which the other does not. Id. In addition, Louisiana courts utilize a somewhat broader “same evidence” test, which considers the actual physical and testimonial eyidence necessary to secure a conviction. State v. Williams, 07-0931, p. 5 (La. 2/26/08), 978 So.2d 895, 897. Under this test, if the evidence required to support a finding of guilt of one crime would also support a conviction for another, the defendant can be placed in jeopardy, for only one of the two. State v. Coody, 448 So.2d 100, 102-03 (La. 1984); State v. Steele, 387 So.2d 1175, 1177 (La. 1980).

Id,

More recently, however, the Louisiana Supreme Court in State v. Magee, 12-1084 (La. 8/25/14), 146 So.3d 193, arguably expressed a narrower view of the |as“same evidence test.” Explaining how Magee appears to have narrowed the test, a commentator stated the following:
[T]he Louisiana Supreme Court appears to have stepped back, from a broader application of the same-evidence test. In State v. Magee, the court held that the evidence used to convict the defendant for illegally carrying a concealed gun would not be the same evidence for a conviction for carrying a stolen weapon. The court determined that in applying the “same evidence” test, it-is still necessary to examine the elements of each offense, not to compare them but rather to determine if they would lead to a conviction for both offenses.
*509 Rebecca A. Delfino, Prohibition on Successive Prosecutions for the Same .Offense-in Search of the “Goldilocks Zone”: The California Approach to A National Conundrum, 54 Am. Crina. L. Rev. 423, 432-33 (2017).
In Magee, the Supreme. Court expressed the narrower “same evidence test” as follows:
Under the “same evidence test” used by Louisiana 'courts in tandem with the Blockburger additional fact test, a court considers the actual physical and testimonial evidence necessary to secure a conviction. State v. Williams, 07-0931, p. 5 (La.2/26/08), 978 So.2d 895, 897. Under this test, if the evidence required to support a finding of guilty of one crime would also support a conviction for another, the defendant- can be placed in jeopardy for only one of the two. State v. Coody, 448 So.2d 100, 102-03 (La. 1984); see also State v. Roberts, 152 La. 283, 286-87, 93 So. 95, 96-97 (1922). The test “depends on the evidence necessary for a conviction, not all the evidence introduced at trial.” State v. Steele, 387 So.2d 1175, 1177 (La. 1980).
In the present case, the evidence that the state would have been required to present to prove defendant illegally carried a concealed weapon, i.e. that he concealed a firearm on his person, would not support a conviction for illegal possession of a stolen firearm. For that matter, evidence that the state is required to present to prove defendant illegally possessed a stolen firearm, that he possessed, received, procured, or concealed a firearm (stolen and known to him to have been stolen) would not support a conviction for carrying a weapon concealed on his person. Thus, the gravamen of the offense for which defendant will be prosecuted was not essentially included within the offense for which he has been prosecuted. Although the state would present the same evidence in both trials because the .two crimes constituted integral acts of a single transaction, and although bathe state would prove the identical conduct in both prosecutions .in support of the facts that it is required to prove to sustain a conviction for either offense, Louisiana’s “same evidence” test has never been the equivalent of. the “same conduct” test .briefly adopted by the United States Supreme Court in Grady v. Corbin, 495 U.S. 508, 510, 110 S.Ct. 2084, 2087, 109 L.Ed.2d 548 (1990) ... and then discarded less than three years later. See United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993)
Magee, 12-1084 at pp. 2-4, 146 So.3d at 195.
Applying either; the Blockburger test or the “same evidence test,” no double.jeopardy violation is established here. In a prosecution for attempted second degree murder, the State must .prove that the defendant: (1) intended to kill the victim and (2) committed an overt act , tending towards the accomplishment Qf.the victim’s death. La. R.S. 14:27(30.1). In a prosecution for illegal use of a weapon during a crime of violence, the State is required to prove: (1) that the defendant intentionally, or through criminal negligence, discharged a firearm, (2) that it was foreseeable.that it may result in death or great bodily harm to a human being, and (3) that the defendant did so while committing, attempting to commit, conspiring to commit or otherwise trying to get someone to commit a crime of violence. La, R.S. 14:94.
Comparing the elements necessary for a conviction of attempted second degree murder with the .elements necessary for a conviction of discharge of a weapon during a crime of violence reveals that each of the offenses requires proof of *510 additional facts that the other does not. Attempted second degree murder does not require the discharge of a firearm; discharge of a weapon does. Attempted second degree murder requires evidence of specific intent to kill; discharge of a weapon during a crime of violence does not. Moreover, attempted second degree murder does not require an underlying crime of violence; discharge of a weapon Undoes. Thus, the offenses of attempted second degree murder and discharge of a weapon during a crime of violence each contain an element of proof that the other does not require. The prosecution for those two offenses therefore would not constitute double jeopardy under the Blockburger test, as Mr. Mahogany acknowledges.
Examining this case under the “same evidence test” produces the same result as under the Blockburger test. The evidence necessary to obtain a conviction for attempted second degree murder is distinct from the evidence necessary for a conviction for discharge of a weapon during a crime of violence. Because the evidence necessary to convict Mr. Mahogany for the offense of discharge of a weapon would not support a conviction for attempted second degree murder, the prosecution of Mr. Mahogany for discharge of a weapon does not violate double jeopardy under the “same evidence test.” Thus, Mr. Mahogany’s reliance on the “same evidence test” is misplaced.
Mr. Mahogany also contends that this case is distinguishable from State v. Allen, 01-2494 (La. 6/21/02), 824 So.2d 344. In Allen, the Louisiana Supreme Court reversed this court’s finding of double jeopardy on convictions for illegal discharge and armed robbery because “the Double Jeopardy Clause does not prohibit conviction and sentence in a single trial for two crimes which would be the same under Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), if the legislature has otherwise manifested its intent to impose cumulative penalties.” Allen, 01-2494 at p. 2, 824 So.2d at 344-45 (citing Missouri v. Hunter, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983)). The Louisiana Supreme Court in Allen also noted that La. R.S. 14:94(F) prohibits illegal use of a weapon by discharging a firearm during the commission of a crime of violence, such as armed robbery.
Mr. Mahogany contends Allen is distinguishable from this case because the basis for the double jeopardy violation is not whether attempted second degree murder was a crime of violence and an element of La. R.S. 14:94(E); rather, he contends that the basis for the double jeopardy violation here is that the same evidence—his shooting at Mr. Brazile—was offered as proof of both offenses. We disagree. Like armed robbery, attempted second degree murder is also a crime of violence under La. R.S. 14:2, and the Legislature “has otherwise manifested its intent to impose cumulative penalties.” Allen, 01-2494 at p. 2, 824 So.2d at 345.
In sum, Mr. Mahogany’s convictions for attempted second degree murder and discharge of a weapon during a crime of violence do not violate double jeopardy. This assignment of error is not persuasive.

Fourth assignment of error

In his fourth and final assignment of error, Mr. Mahogany contends that the sentences imposed on him as a second felony offender—twenty-five years for attempted second degree murder and fifteen years for discharging a weapon during a crime of violence—are excessive for this offense and this offender.[19] He argues that *511 “[t]he minimum sentences, or a downward departure, would be more appropriate under the circumstances, if' the mitigating factors are considered.” (Emphasis supplied).
IsaAs the State points out in its brief and Mr. Mahogany implicitly acknowledges by arguing for a downward departure in his sentence, Mr. Mahogany’s sentence on count one—attempted second degree murder—is the mandatory minimum sentence that the district court could impose under the Habitual Offender Law. A conviction for attempted second degree murder carries a sentencing range of not less than ten or more than fifty years without benefit of parole, probation, or suspension of sentence. La. R.S. 14:27(30.1). Under the Habitual Offender Law, if the second felony is such that upon a first conviction, the offender would be punishable by imprisonment for a term less than his natural life, the mandatory sentencing range is between one-half the longest term and not more than twice the longest term prescribed for a first conviction. La. R.S. 15:529.1(A)(1). Thus, as a second felony offender, the sentencing range for the attempted second degree murder conviction was between twenty-five and one hundred years. The district court imposed the mandatory minimum sentence of twenty-five years.
The Louisiana Constitution prohibits sentences which constitute “cruel, excessive, or unusual punishment.” La. Const. art. 1, § 20. Although within the statutory range, a sentence may nonetheless violate a defendant’s right against excessive punishment. See State v. Brundy, 16-0263, 15-1233, p. 9 (La. App. 4 Cir. 8/24/16), 198 So.3d 1247, 1255 (citation omitted). A sentence is constitutionally excessive if it is grossly disproportionate to the severity of the offense and is nothing more than the needless imposition of pain and suffering. See State v. Bonanno, 384 So.2d 355, 357 (La. 1980). These principles likewise apply to sentences imposed under the Habitual Offender Law. See State v. Dorthey, 623 So.2d 1276 (La. 1993).
| SS“A sentencing judge must always start with the presumption that a mandatory minimum sentence under the Habitual Offender Law is constitutional.” State v. Johnson, 97-1906, p. 7 (La. 3/4/98), 709 So.2d 672, 676. To rebut that presumption, a defendant must establish “clearly and convincingly” that he is exceptional. Id. In this context, “exceptional” is defined to mean that “ ‘because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.’ ” Johnson, 97-1906 at p. 8, 709 So.2d at 677 (quoting State v. Young, 94-1636, pp. 5-6 (La. App. 4 Cir. 10/26/95), 663 So.2d 525, 528 (Plotkin, J., concurring)).
In determining whether a defendant has met his burden of proof to rebut the presumption, the trial court must also keep in mind the goals of the Habitual Offender Law—to deter and punish recidivism. Johnson, 97-1906 at p. 8, 709 So.2d at 676-77. Downward departures from the mandatory minimum sentences under the Habitual Offender Law “should only occur in rare situations.” Id., 97-1906 at p. 9, 709 So.2d at 677.
*512 On appeal, Mr. Mahogany fails to cite any extraordinary circumstance warranting .a departure from the mandatory minimum sentence. The gist of his argument is that the sentences imposed on him as, a second felony offender are excessive for this offense and this offender given that “Mr. Brazile did not sustain a life threatening injury, and the evidence of Mr, Mahogany’s involvement was based solely on Mr. Brazile’s conjecture.” Given Mr. Mahogany’s failure to establish he is exceptional, we find no error in the trial court’s imposition of the mandatory minimum sentence of twenty-five years -on count one, attempted second degree murder.
1 S4As to the other count, a conviction for discharging a weapon during a crime of violence carries a sentencing range of “not less than ten years nor more than twenty years, without benefit of parole, probation, or suspension of sentence.” La. R.S. 14:94(F). As a second felony offender, Mr. Mahogany faced a sentencing range of ten -to forty years. La. R.S, 15:529.1(A)(1). The district court imposed a fifteen-year sentence, which, as'the State points out, in the lower end of the sentencing range.
Contrary to Mr. Mahogany’s contention, the sentences the district court imposed on him .as a second felony offender are supported by the record. In addition, to the evidence presented at trial regarding the offenses at issue in this case, the district court ordered and obtained a pre-sentence investigation report (“PSI”). The. PSI indicates that Mr. Mahogany not only has two prior felony convictions, but also has been arrested multiple times for weapons offenses and burglarizing vehicles. The PSI further indicates that Mr. Mahogany was arrested before Hurricane Katrina on a charge of accessory to manslaughter; however, the report contains no disposition of that charge. At his sentencing hearing, the only evidence Mr. Mahogany presented was his and., his mother’s denial that he committed the offense.
A trial judge is afforded wide discretion in determining a sentence; and, if the record supports the- sentence imposed, the court of appeal.will not set aside a sentence for excessiveness. La. Code Crim. Proc. art. 881.4 D. Such is the case here. Moreover, as noted earlier, a downward departure from a mandatory minimum sentence under the Habitual Offender Law “should only occur in rare situations.” Johnson, 97-1906 at p. 9, 709 So.2d at 677. This is not such a rare situation. Thus, this assignment of error is unpersuasive.
[^DECREE
For the foregoing reasons, the defendant’s convictions and sentences are affirmed,
AFFIRMED

. For ease of discussion, the Statement of the Facts is presented before the Statement of the Case.

. As Mr. Mahogany points out in his brief to this court, Mr. Brazile and Mr. Mahogany "both are self proclaimed promoters of concerts, entertainers and events, whose paths never crossed until the fall of 2011.”

. New Orleans Police Department (“NOPD”) Officer Zenia Smith Williams responded to the November 20, 2011, shooting of Mr. Bra-zile on Downman Road. She testified that Mr. Baham was arrested, convicted of the shooting, and received a twenty-year sentence.

. Mr. Brazile denied ever speaking.to Officer Blackwell; he testified that he only spoke with one officer—Detective Guient, According to Mr. Brazile's hospital records, he had marijuana in his system at the time of the shooting.

. The record reflects that Mr. Brazile’s story changed three times; his three accounts were as follows: (i) Ace or Junior was the shooter in the passenger seat and Mr. Mahogany was the driver; (ii) Mr, Mahogany was the shooter in the passenger seat and Ace or. Junior was the driver; and-(in) Mr. Mahogany was tire shooter in the passenger seat and Mr, Williams was the driver,

. Officer Guient further testified that Mr. Bra-zile also contacted him in reference to another Facebook photo that he had downloaded depicting the driver of the Charger, Mr. Bra-zile, however, called him a few days later and told him that he was not sure of that identification. Mr. Brazile subsequently called him and told him that in mid-March, he was driving on I-10 near Morrison Road when a car pulled up hext to him. He looked over and saw Mr. Williams, whom he recognized from the December shooting. He told the officer that he. and Mr. Williams looked at each other, and then Mr. Williams sped off. Mr. Brá-zile told the officer that he was certain at that point that Mr. Williams had been the driver of the Charger. Officer Guient compiled a second six-person photo lineup that included Mr. Williams' photograph. Mr. Brazile viewed the lineup from which he identified Mr. Williams as the driver of the Charger. Officer Guient also identified a newspaper article that Mr. Brazile had seen that included a photograph of Mr. Williams being arrested for an unrelated incident.

.The cell mate’s name is referred to in the record as both David Murthil and Davin Murthil. We use David Murthil.

. Mr. Murthil testified that Mr. Brazile’s actual nickname was "Scoonie,” not Spooney,

. Mr. Murthil admitted that he was convicted in 2011 and that he was incarcerated at the *499 tíme of Mr. Mahogany’s trial. Although he denied being promised or offered anything in return for his testimony, he acknowledged that he would like to receive some consideration for his testimony. The State stipulated to the following facts: (i) Mr. Murthil has three prior convictions for possession of cocaine and a 2011 conviction for burglary; (ii) Mr. Murthil was sentenced to ten years for the burglary conviction; and (iii) Mr. Murthil could receive a sentence of twenty years to life if adjudicated a multiple offender for the 2011 conviction.

. State v. Mahogany, 13-256 (La. App. 4 Cir. 4/17/13) (unpub.).

. State v. Mahogany, 13-1099 (La. 5/16/13), 117 So.3d 508.

. Although Mr. Mahogany was tried and convicted with Mr. Williams, this appeal involves only Mr. Mahogany. Mr. Williams appeal is pending before a different panel of this court in State v. Williams, No. 2016-KA-0982. On July 19, 2012, the other co-defendant, Mr. Baham, pled guilty to attempted second degree murder and to discharging a firearm during a crime of violence in exchange for an agreed-upon twenty year sentence.

.- The record reflects that Mr. Mahogany also filed a Motion to Reconsider Sentence on February 9, 2015.

. The other error patent we noted in our earlier decision related to the timing of Mr. Mahogany's post-trial motions; we noted as follows;
Mr. Mahogany was sentenced on June 3, 2014, ánd on September 9, 2015, the trial court permitted Mr. Mahogany to file out of time motions for new trial and post-verdict judgment of acquittal. Both motions were denied that same day. La.C.Cr.P. arts. 853 and 821, mandate that those motions be ruled on prior to sentencing. Generally, where the trial court has not ruled on the motions prior to sentencing it is an error patent, requiring the sentence be vacated and the matter remanded for re-sentencing.
Mahogany, 15-0818 at p. 3, 191 So.3d at 617.
In this appeal, Mr. Mahogany does not complain of the chronological error. To the contrary, he contends that there was no error patent because at the original sentencing, the State filed a multiple bill of information. In response, Mr. Mahogany filed a Motion to Quash. Mr. Mahogany points out that “[n]either had been heard at the time that the first appeal was filed and briefed.” He further points out that he filéd a motion to reconsider the original sentence and that "[s]entencing had not been complete by September 9, 20.15.” On that date, as noted elsewhere, • all three post-trial motions were denied.' Thus, Mr. Mahogany contends that “the motions were handled before or contemporaneously with the finalization of the sentence.” He explains that “on -that date, the status and sentencing were still pending on the multiple bill.” Regardless, as he acknowledged in a supplemental brief in the prior appeal, “[t]he error patent of filing post trial motions after the initial sentencing is not prejudicial to the defendant where the sentencing was not final at the time the motions were made and the defendant’s appeal on the excessiveness of the sentencing was preserved.”

. In Nanlal, the Louisiana Supreme Court remanded to the district court for an eviden-tiary hearing on the issue of whether the defendant validly waived his right to a juiy trial.

. Mr. Mahogany was also convicted of discharge of a firearm during a crime of violence. Pursuant to La. R.S. 14:94, the intentional discharging of a firearm is prohibited when it is foreseeable that it may result in death or great bodily harm to a human being during the attempt or commission-of a crime of violence. To convict a defendant of discharging a weapon during a crime of violence, the State must prove are as follows: (i) that the defendant intentionally, or through criminal negligence, discharged a firearm; (ii) that it was foreseeable that it may result in death or great bodily harm to a human being; and (iii) that the defendant did so while committing, attempting to commit, conspiring to commit or otherwise trying to get someone else to commit a crime of violence. State v. Dussett, 13-0116, p. 6 (La. App. 4 Cir. 10/2/13), 126 So.3d 593, 598 (citing State v. Brown, 42,188, pp. 39-40 (La. App. 2 Cir. 9/26/07), 966 So.2d 727, 755-56).

. La. C.Cr.P. art. 780 B was amended, effective June 17, 2013, to provide in relevant part:
The defendant shall exercise his right to waive trial by jury in accordance with Article I, Section 17 of the Constitution of Louisiana. The waiver shall be by written motion filed in the district court not later than forty-five days prior to the date the case is set for trial. The motion shall be signed by the defendant and shall also be signed by defendant’s counsel unless the defendant has waived his right to counsel.

. The requirements for double jeopardy are set forth in La. C.Cr.P. art. 596, which provides:
Double jeopardy exists in a second trial only when the charge in that trial is:
(1) Identical with or a different grade of the same offense for which the defendant was in jeopardy in the first trial, whether or not a responsive verdict could have been rendered in the first trial as to the charge in the second trial; or
(2) Based, on a part of a continuous offense for which offense the defendant was in jeopardy in the first trial.

. On his original appeal, Mr. Mahogany challenged the excessiveness of his original *511 sentence for attempted second degree murder. When the original sentence has been vacated and an enhanced sentence imposed, “any argument relative to the underlying sentence is moot.” State v. Castillo, 13-552, p. 27 (La. App. 5 Cir. 10/29/14), 167 So.3d 624, 648 (citing State v. Hanson, 00-1168 (La. App. 5 Cir. 12/13/00), 778 So.2d 43, 45). Such is the case here.