STATE OF LOUISIANA      *      NO. 2021-KA-0506

VERSUS      *

     **COURT OF APPEAL**

HUGH GILLIAM      *

     **FOURTH CIRCUIT**

     *

     **STATE OF LOUISIANA**

* * * * * * *

APPEAL FROM
ST. BERNARD 34TH JUDICIAL DISTRICT COURT
NO. 19-02197, DIVISION "E"
Honorable Eric A. Bopp,
* * * * * *
**LYNN M. LUKER**
**JUDGE PRO TEMPORE**
* * * * * *

(Court composed of Judge Edwin A. Lombard, Judge Sandra Cabrina Jenkins, Judge Lynn M. Luker, Pro Tempore)

DANIEL J. DYSART, ASSISTANT DISTRICT ATTORNEY
ASHTON LICCIARDI, ASSISTANT DISTRICT ATTORNEY
St. Bernard District Attorney's Office
1101 W. St. Bernard Hwy.
St. Bernard, Louisiana 70043
       Counsel for Plaintiff/Appellee

SHERRY WATTERS
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, Louisiana 70158
       Counsel for Defendant/Appellant

**CONVICTIONS AND SENTENCES AFFIRMED**

**MARCH 10, 2022**

*LML*
*EAL*
*SCJ*

Defendant, Hugh Gilliam, appeals his conviction and sentence on one count of sexual battery and one count of indecent behavior with a juvenile. For the following reasons, we affirm defendant's conviction and sentence on both counts.

**PROCEDURAL HISTORY**

On July 31, 2019, the state filed a bill of information charging defendant with one count of molestation of a juvenile in violation of La. R.S. 14:81.2(A)(1), to which defendant plead not guilty. Victim-impact statements were provided by the juvenile's family members at a pretrial hearing. On January 16, 2020, the state moved for a competency evaluation. Following a hearing on the matter, defendant was found competent to stand trial.

On April 29, 2021, the state filed a superseding bill of information charging defendant with one count of sexual battery and one count of indecent behavior with a juvenile, violations of La. R.S. 14:43.1(A)(2), and La. R.S. 14:81(A)(1), respectively. Defendant entered pleas of not guilty on May 3, 2021, and trial commenced the following day. On May 6, 2021, the jury returned unanimous verdicts of guilty as charged on both counts.

1

Defendant filed a motion for new trial asserting that the verdict was contrary to the evidence and that the trial court erred in denying the defendant's oral motion for mistrial made during the jury deliberations. The motion for new trial was denied.

After observing all sentencing delays, the trial court imposed a sentence of forty years imprisonment at hard labor on the count of sexual battery, with twenty-five years, to be served without the benefit of parole, probation or suspension of sentence. On the count of indecent behavior with a juvenile, the trial court imposed the maximum sentence of twenty-five years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The two sentences were to run concurrently, and defendant was given credit for time served. Defendant's appeal followed.

**STATEMENT OF FACT**

On March 29, 2019, L.N.[1], a six-year-old female, accompanied her mother, J.N. and eight-year-old brother to a trailer park in Chalmette, Louisiana, where J.N. was hired to clean a trailer. James Norsworthy, a former St. Bernard Sheriff's deputy, testified at trial that on March 29, 2019, he was dispatched to a call at 1900 Andres Street in Chalmette. There, he met with J.N. who was present with her daughter, L.N. and her eight-year-old son. He stated that according to J.N., she was inside cleaning a trailer while her children played just outside. At some point, J.N. realized that L.N. was gone. According to Norsworthy's testimony, L.N. told

---

[1] La. R.S. 46:1844(W) prohibits the public disclosure of the names, addresses, or identities of crime victims under the age of eighteen (18) and of all victims of sex offenses, but instead authorizes the use of initials and abbreviations. In the "interest of protecting minor victims and victims of sexual offenses," victims and defendants or witnesses whose names can reveal the victims' identities are referred to only by initials. *State v. Williams*, 17-0544, p. 1, n. 1 (La. App. 4 Cir. 3/14/18), 240 So.3d 355, 357 (citing *State v. Ross*, 14-00, 84, p. 3, n. 3 (La. App. 5 Cir. 10/15/14), 182 So.3d 983, 985).

her mother (after the incident) that she saw defendant flying a drone nearby, and went to defendant's residence alone. Norsworthy explained that defendant, known to J.N. from the neighborhood as Jeff, lived across the street and just one trailer down toward the levee.

Norsworthy reported that when J.N. went to look for L.N. she found her "on the other side of [defendant's] trailer." She saw L.N. "with her pants down and [defendant] squatted down in front of her with his phone in his hand like he was trying to take a picture of her." L.N. initially denied that anything inappropriate occurred, but after further questioning, L.N. stated that after her pants were pulled down, defendant touched her vaginal area with his fingers. Norsworthy authored an incident report and forwarded the complaint to the detective bureau where it was assigned to Det. Michele Capena.

On cross-examination, Norsworthy stated that J.N. did not pressure L.N. into making any statements, notwithstanding L.N.'s initial statement that nothing happened while her pants were pulled down. He further explained that he did not speak to defendant at the time because defendant had already left for work. Consequently, he was unable to inspect the drone or any footage the attached camera may have recorded. Norsworthy did not speak to any neighbors.

J.N. testified at trial that she resided with her husband and two children in Gonzalez, Louisiana. She stated that she cleaned houses for a living, including in St. Bernard Parish. She explained that she regularly brought her children with her to clean houses.

On March 29, 2019, J.N. was in Chalmette cleaning the trailer of an acquaintance named Corey. At that time, she was introduced to defendant as Jeff Gilliam, when he came over to speak to Corey. J.N. stated that her children met

3

defendant at the same time she did. J.N. identified defendant, as Jeff Gilliam, in the courtroom.

J.N. reported that just before the incident occurred, she was outside of the trailer eating lunch with her children when defendant approached them, asking for Corey. She explained that Corey was inside the trailer sleeping. Defendant left and returned with a white drone, which J.N. stated caught her daughter's attention. After lunch, J.N. told the children to come inside the trailer with her while she finished cleaning, but the children wanted to stay outside. Defendant offered to stay with them, but J.N. declined his assistance. J.N.'s son again asked if they could stay outside and told J.N. they would remain on the porch and that he would watch his sister. J.N. acquiesced, but stated that she left the trailer door open while she finished cleaning.

J.N. testified that while she proceeded to clean, she noticed her son alone inside the trailer without L.N. He informed his mother that L.N. walked away with defendant. J.N. ran outside but did not see L.N.; she panicked and began shouting for her daughter. She eventually ran behind defendant's trailer where she saw L.N. and defendant, "with her pull-up and her shorts down to her ankles."[2]

J.N. stated that L.N. was facing defendant with her back to J.N., but J.N. was able to see her daughter's bare buttocks. J.N. could tell that L.N.'s vaginal area would also have been exposed in the front. J.N. testified that L.N. was standing upright with her hands out. Defendant was squatting down a few inches in front of L.N., "down by her private area, eye contact with it." J.N. further stated that she saw a phone in one of defendant's hands and could see "the elbow moving up and

_____

[2] J.N. explained that L.N. wore pull-up diapers (even at the time of trial) because she had issues using the toilet.

4

down." She denied that L.N. was squatting down or using the restroom in defendant's yard, and denied that L.N. had ever used the restroom outside or in anyone's yard.

Upon seeing L.N. with defendant, J.N. yelled and ran toward them. Defendant ran to the other side of his trailer and locked himself inside while J.N. continued to bang on his front door. J.N. stated that L.N. kept apologizing. J.N. picked L.N. up and brought her back to Corey's trailer. L.N. told her mother that defendant was showing her pictures of doctors on his phone, and "patting [her] tutu, he was just touching it." J.N. explained that L.N. used the word "tutu" as a term for her vagina. L.N. further told her mother that defendant wanted L.N. to pull her pants down, but she needed help, so defendant helped her.

Once J.N. brought L.N. back inside the trailer, she noticed that L.N,'s diaper was wet. L.N. admitted that she urinated in the diaper, but explained that it happened when J.N. started screaming and picked her up. J.N. testified that she gave her statements to the police shortly after the incident, and the detective scheduled a forensic interview at the Child Advocacy Center ("CAC") for L.N. several days later.

On cross-examination, J.N. admitted that she told the police that when she first demanded to know what happened, L.N. replied, "[n]othing, mother, I'm okay." However, J.N. testified that she actually could not recall L.N. telling her that nothing happened. She could only recall L.N. repeating "[i]t's okay, it's okay, it's okay…" notwithstanding what was written in the police report.

J.N. described defendant as wearing a T-shirt and jean-shorts on the day of the incident. She noticed he wore glasses and had tattoos on his arms. J.N. stated that on the day she brought L.N. to the CAC for her forensic interview, L.N. had

5

placed a temporary tattoo on her arm. J.N. told L.N. that tattoos were not supposed to go on people's arms, but L.N. replied, "Well, [defendant] got them on his arm." When asked why L.N. would tell the interviewer that the person who touched her did not have tattoos, J.N. speculated that it was because she had told L.N. that defendant did not have any tattoos in an attempt to avoid the discussion. J.N. also testified that she could not recall whether she told the police or Det. Capena about defendant having tattoos.

Det. Capena testified that in April 2019, she was assigned to a case involving defendant, Hugh Gilliam, who she identified in open court. Det. Capena confirmed that when J.N. approached defendant's yard, she could see that L.N.'s pants and diaper were pulled down and that defendant was moving his arm, though defendant's hand was not visible. J.N. screamed, and defendant hurried away. J.N. also explained to Det. Capena that L.N. had "difficulties with her movements and stuff, and that [was] why she [wore] a diaper at her age." Det. Capena also confirmed that J.N. identified defendant by name during her statements to police, as she was familiar with him from the neighborhood.

Det. Capena stated that defendant signed a waiver of rights form, on which he indicated he was born on March 3, 1989. Defendant also agreed to provide a recorded statement, which was played in open court.

In his recorded interview with Det. Capena, defendant admitted that he saw L.N. in the area of his home on March 29, 2019, but insisted that "he did not get within ten feet of the child," nor did he claim to have rendered any medical or sanitary care to the child at any time. Defendant denied that he touched L.N. or that he removed her clothing at any time. He stated that J.N. was either mistaken or lying when she gave the account reflected in the police report. He also

6

questioned why J.N. waited three hours to report the alleged incident to the police, and simply returned to Corey's trailer as if nothing happened. Defendant stated that he never met either L.N. or J.N. Defendant admitted that he had been outside his residence alone flying his drone near the front corner of his trailer. He explained that he wore goggles through which he could only see what the drone camera's viewfinder reflected. At some point, he noticed someone in his yard through the goggles, causing him to crash the drone into a nearby tree. Defendant stated that the person in his yard was a female child, whom he described as squatting in the corner near the fence. He did not realize that she was nude from the waist down until he began to approach the child, and she stood up. At that time, the child's mother appeared screaming and told the child to leave.

Defendant denied that he was squatting down near the child, and he denied that he ran back into his trailer. Rather, he explained that he was preoccupied with finding his broken drone and paid little attention to L.N. He stated that he asked his roommate Mike to help look for the drone.[3] Det. Capena asked defendant why he thought L.N. or J.N. would falsely accuse him of touching the child inappropriately. Defendant speculated that L.N. may have been molested by someone during a previous encounter, and suggested that he heard a rumor that "something [was] psychologically wrong with her."

Defendant believed that his friend Casie ("Ms. Brouillette") could corroborate his version of events. He offered to send Det. Capena a recorded telephone conversation, wherein Ms. Brouillette claimed to be on top of the levee that day and observed L.N. squatting in defendant's yard as if the child were using the restroom. Defendant further stated that Ms. Brouillette told him that she saw

---

[3] It does not appear that the roommate was questioned.

7

L.N. urinating and defecating in other people's yards around the neighborhood. Defendant also claimed that he had never been accused of inappropriate behavior with any of his friends' children.

Defendant again questioned the veracity of J.N.'s statements to the police, explaining that after J.N. made L.N. leave his yard, the children simply resumed playing outside of Corey's trailer. Defendant also suggested that someone with the intent to molest a child would have made the effort to conceal his or her actions rather than engage in the conduct in a publicly-visible yard. He stated that Corey believed defendant's version of events. Defendant further believed that the responding police officer obviously believed him too; otherwise he would have been arrested on the spot.

Ms. Brouillette testified at trial that she resided in front of the mobile home park on Andres Street and was familiar with defendant, although she knew him as "Jeff" Gilliam. She testified that during the time of the incident, she had stomach cancer, making it impossible for her to have climbed to the top of the levee, as defendant reported. Ms. Brouillette denied seeing the child in defendant's yard at any time, using the restroom or otherwise. She also denied knowing J.N. or L.N. On cross-examination, Ms. Brouillette stated that she was aware that defendant regularly flew a drone around the neighborhood and explained that it was his "pride and joy."

Det. Capena testified further that she interviewed Corey and Ms. Brouillette. Corey declined to provide any statements, while Ms. Brouillette claimed she had not been on the levee the day of the incident (or any other day). Ms. Brouillette also stated that she was not in the neighborhood on the day of the incident and did not see L.N. in defendant's yard at any time.

8

On cross-examination, Det. Capena testified that defendant had visible tattoos on his arms, which she was able to observe during the recorded interview because he was wearing a short-sleeved shirt. She further stated that she did not seize defendant's drone, as she assumed it was inoperable after defendant indicated it had crashed. Det. Capena did not seize defendant's cell phone.

Det. Capena reported that on April 11, 2019, L.N. underwent a medical examination and forensic interview at the CAC. The interviewer was Katie Homan ("Ms. Homan"). Det. Capena was present, and observed the interview from a monitor in a separate room. The recorded forensic interview was shown to the jury.

Ms. Homan testified that she had a master's degree in psychology, specializing in behavioral health. She worked as a contract forensic interviewer at the CAC, where she conducted a recorded interview with L.N. Ms. Homan wore an earpiece through which Det. Capena could communicate with her in an effort to conduct a more thorough interview. She authenticated the video recording of the interview that was introduced into evidence.

On cross-examination, Ms. Homan admitted that she did not know, nor attempt to determine, whether L.N. had been coached to make specific statements prior to the interview. She also did not ascertain whether L.N. understood the difference between the truth and a lie, stating that her job was to provide a space to the children in whatever they wanted to say and follow their lead. Ms. Homan further explained that asking a child to differentiate between the truth and a lie was "not supported by forensic interviewing research" anymore. Ms. Homan also testified that prior to interviewing L.N., she was aware that the child suffered from

a learning disability. She also recalled that the child was wearing a (temporary) tattoo, and that L.N. knew what tattoos were.

At the outset, we note from viewing the recorded interview that L.N. appeared to have a speech impediment, making it difficult to understand much of what she attempted to express. However, Ms. Homan, made every effort to confirm L.N.'s statements.

In the interview, L.N. described the day of the incident, stating that she went with her mother to clean a residence in Chalmette. While her mother was cleaning, L.N. was outside and saw a man playing with a drone.[4] L.N. stated that she did not know the name of the man, but that she could remember him. The man showed her some pictures, which she described as "weird pictures" of two doctors rubbing a "tutu."[5] The man told L.N. that he wanted to do to her "in real life" what the doctors were doing in the pictures, although she stated that she did not want to. L.N. explained that the man made her pull down her pants, and he began rubbing her vaginal area. L.N. confirmed that although the man showed her pictures on his phone, he had not taken any pictures of her at any time.

When Ms. Homan asked how she felt about the man touching her, she replied, "It was nice, but it was warm, but I think it was bad." L.N. stated that while the man was touching her, J.N. appeared and began yelling at the man, who ran inside his house. She thought her mother wanted to fight the man, but they could not find him. In response to more specific questioning, L.N. stated that at some point, the man told her he would give her $1,000, but she never received the

---

[4] L.N. initially described the subject as either a boy or a man."
[5] L.N. later confirmed that she understood that a "tutu" was a private area used for "pee and poo."

10

money.  She stated that she pulled her pants up by herself after the incident, and that the man had touched her using only his hand.

L.N. described the man who touched her as having glasses and short hair, with "big legs," "little arms," and "no muscles."  She also stated that the man did not have any tattoos, and showed Ms. Homan two temporary tattoos she had placed on her own forearm.  L.N. stated that the man was very close to her when he touched her, and that he had not undressed at any point.  She also stated that she had only been touched in that area one time, and never before or since, and that she had never seen the man who touched her before or since the incident. [6]

L.N. was eight years old when she testified at the trial.  She recalled the day she went to Chalmette while her mother cleaned a trailer, and she recalled meeting a man who was flying a drone.  She recalled going to the CAC interview to talk about an incident that had occurred.  She testified that she told the truth during that interview.  She also stated that she was present at the trial to tell the truth about what happened that day.

On cross-examination, L.N stated that her mother was very angry at the time of the incident, and she thought her mother was still upset at the time of trial.  L.N. explained that when her mother found her in defendant's yard, she thought that defendant ran either behind the trailer or behind the car.  L.N. also recalled that she had a fake tattoo on her arm during her forensic interview and testified that she understood the difference between real tattoos and fake tattoos.  She stated that the man flying the drone the day of the incident did not have any tattoos.

---

[6] The remainder of the interview mostly confirmed L.N.'s previous statements, although when asked again about the pictures on the man's phone, L.N. stated that in addition to the photos of the two doctors, she also saw photos of men going into houses.  She stated her belief that the man who touched her was "about to go to jail."

**ERRORS PATENT**

A review of the record in accordance with La. C.Cr.P. art. 920 reveals no errors patent.[7]

**LAW AND ANALYSIS**

*Assignment of Error No. 1*

In defendant's first assignment of error, he argues that the evidence is insufficient to support the convictions. Defendant maintains that the state failed to prove every element of the crimes charged beyond a reasonable doubt, including defendant's identity as the perpetrator. More specifically, defendant asserts that the state relied solely on the testimony of L.N., who initially stated that "nothing happened," then changed her story to reflect that the boy or man who touched her had no tattoos.

In addressing sufficiency of evidence, appellate courts are controlled by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In *State v. Pigford*, 05-0477, pp. 5-6 (La. 2/22/06), 922 So.2d 517, 520-21, the Louisiana Supreme Court explained the standard is as follows:

> In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La. 1984). This standard, now legislatively embodied in La. C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder. *State v. Robertson*, 96-1048, p. 1 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La. 1990). A reviewing court may intervene in the trier of fact's decision only to the extent

---

[7] La. C.Cr.P. art. 920(2) defines errors patent as errors "discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

necessary to guarantee due process of law. *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988). Accordingly, in cases relying on circumstantial evidence to prove one or more elements of the crime, when the fact-finder reasonably rejects the hypothesis of innocence advanced by the defendant at trial, that hypothesis fails, and the verdict stands unless the evidence suggests an alternative hypothesis sufficiently reasonable that rational jurors could not find proof of the defendant's guilt beyond a reasonable doubt. *State v. Lee*, 01-1080, p. 12 (La. 11/28/01), 800 So.2d 833, 841; *Captville*, 448 So.2d at 678.

*Id.; See also State v. Brown*, 16-0965, p. 10 (La. App. 4 Cir. 5/3/17), 219 So.3d 518, 527.

Circumstantial evidence is "evidence of facts or circumstances from which one might infer or conclude the existence of other facts." *State v. Amos,* 15-0954, p. 11 (La. App. 4 Cir. 4/6/16), 192 So.3d 822, 835 (citing *State v. Carter*, 99-2234, p. 31 (La. App. 4 Cir. 1/21/01), 779 So.2d 125, 144). When a conviction is based on circumstantial evidence, the evidence "must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *Id.*

"[W]hen the State uses circumstantial evidence to prove the elements of the offense, La. R.S. 15:438 requires that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.' " *State v. Williams*, 11-0414, p. 16 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 770 (citing *State v. Neal*, 00-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657). In *State v. Davis*, 92-1623, p.9 (La. 5/23/94), 637 So2d. 1012, 1020, the Louisiana Supreme Court further held:

In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a

rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia.*

*Id.*

Regarding credibility determinations, this Court explained:

It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. *State v. Richards*, 2011-0349, p. 9 (La. App. 4 Cir. 12/1/11), 78 So.3d 864, 869. The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. *Id.* Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion. *State v. Rapp*, 2014-0633, pp. 6-7 (La. App. 4 Cir. 2/18/15), 161 So.3d 103, 108 (citing *State v. Marshall*, 2004-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369).

*State v. Gabriel*, pp. 8-9 (La. App. 4 Cir. 12/26/18), 262 So.3d 345, 351.

In the present case, defendant contends that the state failed to prove the charges of sexual battery and indecent behavior with a juvenile beyond a reasonable doubt. We separately address each conviction.

***Sexual Battery***

The jury found defendant guilty of sexual battery, which is defined in pertinent part as "the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, . . . [when] the victim has not yet attained fifteen years of age and is at least three years younger than the offender." La. R.S. 14:43.1(A)(2).[8]

At the outset, we note that the age parameters set forth in the statute are met. L.N. was six years old at the time of the incident, while defendant confirmed that

---

[8] *See also* La. R.S. 14:43.1(B), which provides that "[l]ack of knowledge of the victim's age shall not be a defense. However, normal medical treatment or normal sanitary care shall not be construed as an offense under the provisions of this Section."

he was born in 1989.  Defendant asserts, however, that the state's evidence is insufficient to prove that he was the perpetrator because L.N. did not specifically identify him, and told the interviewer that the man who touched her did not have tattoos.

It is well established in the jurisprudence that "[w]hen the challenge is to the defendant's identity as the perpetrator, the prosecution is required to negate any reasonable probability of misidentification." *State v Mahogany*, 17-0377, pp. 19-20 (La. App. 4 Cir. 7/26/17), 225 So.3d 489, 504 (citing *State v. Pierce*, 12-0879, p. 4 (La. App. 4 Cir. 12/10/13), 131 So.3d 136, 140).  However, it is also well established that "[a] positive identification by only one witness is sufficient to support a conviction." *State v Everret*, 11-0714, p. 15 (La. App. 4 Cir. 6/13/12), 96 So.3d 605, 619 (citing *State v. Leger*, 05-0011, p. 92 (La. 7/10/06), 936 So.2d 108, 170).

Here, L.N. stated in the forensic interview that the man who touched her was flying a drone near the trailer her mother was cleaning.  More importantly, she was not the only witness who provided testimony regarding the perpetrator's identity.  J.N. gave an in-court identification of defendant, as the man she saw squatting down at eye-level with her daughter's nude genitalia.  J.N. recognized defendant as the man she met earlier that day.

The evidence also demonstrates that defendant placed himself at the scene of the incident.  He admitted to Det. Capena that he was flying a drone near his trailer on the day that he met L.N.  Moreover, he admitted that L.N. was in his yard, nude from the waist down, with her pants around her ankles.  There was no testimony introduced at trial that L.N. was ever seen nude from the waist down in anyone

15

else's yard. Thus, there was no evidence that L.N. may have confused the event with another time or another person.

Upon review of the record, we find that the evidence presented at trial established each element of the offense of sexual battery beyond a reasonable doubt. We further find that L.N.'s statement that the man who touched her had no tattoos does not negate the overwhelming evidence presented by the state.

### *Indecent Behavior with a Juvenile*

Defendant was also convicted of indecent behavior with a juvenile pursuant to La. R.S. 14:81(A)(1). To sustain a conviction for this offense, the state was required to prove: (1) an age difference of more than two years between the defendant and the victim, who was not yet seventeen; (2) that defendant committed a lewd or lascivious act upon the person or in the presence of the victim; and (3) that defendant intended to arouse or gratify either the victim's or his own sexual desires. La. R.S. 14:81(A)(1); *State v. Summers*, 10-0341, p. 7 (La. App. 4 Cir. 12/1/10), 52 So.3d 951, 956 (citing *State v. Anderson*, 09-934, pp. 6-7 (La. App. 5 Cir. 3/23/10), 38 So.3d 953, 957-958).

As previously stated, the ages of defendant and L.N. are not in dispute. Regarding the terms lewd and lascivious, in *State v. Shaikh*, 16-0750, pp. 3-4 (La. 10/18/17), 236 So.3d 1206, 1208, the Louisiana Supreme Court explained:

> The word 'lewd' means lustful, indecent, lascivious, and signifies that form of immorality which has relation to sexual impurity or incontinence carried on in a wanton manner. *State v. Prejean*, 216 La. 1072, 1078, 45 So.2d 627, 629 (1950). "The word 'lascivious' means tending to excite lust, lewd, indecent, obscene, relating to sexual impurity, tending to deprave the morals in respect to sexual relations. *Id*. All manner of obnoxious behavior has been held to constitute 'lewd and lascivious conduct.' *See, e.g., State v. Robinson*, 43,063, p. 8 (La. App. 2 Cir. 2/13/08), 975 So.2d 853, 858 (defendant groped the victim, called her "baby", and commented that he

could not help himself); *State v. Guillory*, 07-0422, pp. 1-2 (La. App. 3 Cir. 10/31/07), 970 So.2d 670, 672 (teacher brushed a student's legs with papers and asked her if it tingled and how it made her feel "below"); *State v. Forbes*, 97-1839, pp. 3-4, 6-7 (La. App. 1 Cir. 6/29/98), 716 So.2d 424, 427 (finding a rational trier of fact can conclude defendant committed a lewd and lascivious act by reaching under the victim's t-shirt to touch her breasts and reaching into her underpants to touch the area below her naval near her vagina); *State v. Sturdivant*, 27,680, pp. 1-2 (La. App. 2 Cir. 2/28/96), 669 So.2d 654, 656 (a parent, while receiving a school tour, made sexual comments to a 13-year-old and then groped her); *State v. Kohl,* 524 So.2d 781, 784 (La. App. 3 Cir. 1988) (defendant's rubbing of his beard on crotch of sleeping victims sufficient to prove violation of R.S. 14:81).

*Id.*

Here, defendant argues that the state failed to present evidence that he specifically intended to gratify either the child or his own sexual desires. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific intent is a question for the trier of fact, and "may be inferred from the circumstances of the offense and from the defendant's own conduct." *State v. Chambers*, 16-0712, p. 8 (La. App. 4 Cir. 2/15/17), 212 So.3d 643, 648 (citing *State v. Ordodi*, 06-0207, p. 11 (La. 11/29/06), 946 So.2d 654, 661). Moreover, the specific intent element of La. R.S. 14:81 does not require evidence of actual arousal, "but only an intention of arousing or gratifying the sexual desires of either person." *State v. Kohl*, 524 So.2d 781, 784 (La. App. 3 Cir. 1988); *See also State v Bridges*, 52,104, p. 9 (La. App. 2 Cir. 6/27/18) 251 So.3d 661, 667.

In this case, L.N. stated in her forensic interview that defendant showed her pictures on his phone of two "doctors" rubbing female genitalia, and told her that he wanted to do the same to her "in real life." Then, defendant pulled down her

pants and pull-up and began rubbing her vaginal area. No evidence presented at trial suggested that defendant intended to administer sanitary or medical assistance to the L.N. Under the circumstances, the jury was free to infer that the reason defendant wanted to undress a child from the waist down and fondle her vagina with his bare hand was indeed for the sexual gratification of either the child, himself, or both.

After considering the record, we find that the state's evidence clearly established each element of the offense of indecent behavior with a juvenile. This assignment of error lacks merit.

### Assignment of Error No. 2.

Defendant asserts that the trial court erred in denying his motion for a mistrial and motion for a new trial based on the improper coercion of jurors and improper instruction to the jury to continue deliberations.

The record reveals that shortly after the jury retired to deliberate, it sent down a note to the trial court stating that the vote was eleven to one on both counts, and asked what the next steps would be. Both parties, including defendant himself, agreed that the best course of action would be to send a note to the jury requesting that it continue to deliberate in an effort to reach a unanimous verdict. Specifically, the agreed-upon note read, "It is early in the process. I would encourage you to continue to deliberate in an effort to reach a unanimous verdict. Is there anything from the Court that would assist you in further deliberations?" The jury responded, asking to view defendant's recorded statement and L.N.'s forensic interview. They also requested to read the transcript of L.N.'s cross-examination. Defendant objected, and the trial court agreed. The trial court

responded to the jury's request with a note stating that the law required the jurors to rely on their "memory as the evidence was presented during trial."

The jury then asked what evidence it would be permitted to view during deliberations, which the parties agreed would be none. Before the last response was actually communicated to the jury, another note was sent down from the foreperson stating, "So it has come up that one member of the jury may have knowledge of the defendant and the others involved in the case. This information was unknown to the rest of the jury." Defense counsel immediately stated, "Yeah, Judge, on the record, the juror in question has to be examined by the court. If it's found to be true and it was not revealed at *voir dire* then that juror would be eliminated, and then since the alternates have already been released it would be a mistrial." The trial court agreed and summoned the juror in question (hereinafter "juror X") to chambers, along with a note responding to the jurors' prior question that they would not be permitted to review any evidence from the trial and must rely instead on their memories.

The trial court explained to the parties that it would conduct a brief examination of juror X in the presence of the parties, but that it would specify to the juror not to discuss the jury's deliberations, to which all parties agreed. Once in chambers, the trial court told juror X that "I don't want to talk about what's being talked about upstairs or deliberation." The clerk then read the foreperson's note. Juror X replied, "I have no clue who this guy is at all. I swore that under oath. Are they saying I know the guy on trial because they want me to agree with them?" The trial court again asked juror X not to repeat anything that was discussed during deliberations, and stated, "[a]ll I want to know is this: Do you know Mr. Gilliam?" She replied, "No." Juror X further denied knowing L.N., her

19

family, or any of the testifying witnesses. The trial court concluded the examination and sent juror X back to the jury room. The trial court then stated its intention to request that the jurors resume deliberation.

Defense counsel then suggested that there may have been "dissension in the jury room" and opined that the rest of the jury was trying to get juror X in trouble or get her kicked off the jury in order to secure a unanimous verdict. The trial court replied that it was not going to "automatically declare a mistrial" because there may be dissension among the jurors, unless the jurors themselves state that they cannot deliberate further. Defense counsel repeated his concern, stating that the juror could be a holdout vote either way, for guilty or not guilty, but the trial court declined to "read[] into it." Defense counsel then asked the trial court to bring the foreperson into chambers to determine the substance behind the accusation, to which all parties ultimately agreed.

The trial court asked the foreperson not to reveal any discussions had during deliberation, but asked how the information came about that juror X may know defendant or any of the other parties involved. The foreperson replied:

> It's not about deliberation necessarily. It's about facts or about people that were involved in the case that, you know, oh, this person is this, and we don't know that. Like this person, this is what happened to this person. We were like, we don't know that. We didn't know that. And unless you knew these people prior to which we were all asked previously or if you looked it up, you wouldn't know that, and it was just something that a few of us said that somethings' not—we didn't receive that information in the case.

The trial court sent the foreperson back to the jury room and summoned juror X to chambers for a second time. No objections were lodged on the record.

In the second conversation with juror X, the trial court again warned her not to discuss anything said during deliberations, and asked if she had done any

outside investigating or had extraneous knowledge beyond what was presented during trial. She replied, "No. If anything, I was asking for more knowledge for the things that was making me lean to not guilty." The trial court stated, "I didn't want to do that," and again cautioned her not to "talk about deliberations." She stated, "Okay. But no, I had no clue. I was wracking my brain thinking I had no clue about anything. I mean, I've never even—you know, most people in the parish know each other or at least the last name or something." She further denied having done any outside investigation or having any extraneous knowledge of the case. Following that colloquy, defendant moved for a mistrial alleging that the holdout juror had been singled out by the rest of the jury in an attempt to have her removed, and suggesting that jury deliberations may have been tainted.

The state opposed the motion, contending that the jury was doing "what they should be doing," in that they were asking questions about the evidence and deliberating the issues. The trial court agreed with the state, finding that no evidence had been presented that the jury was tainted. The trial court stated its satisfaction that juror X did not know any of the trial participants, and had no extraneous knowledge outside of the evidence presented at trial. The trial court further stated that "I do think more deliberation is needed. And if they find they still can't return a verdict, then we'll address the issue of a hung jury at that time. But right now, I don't believe that the jury is tainted in any way."

The trial court explained, "Unfortunately they sent a note down with some misinformation, but this is what jurors do. They're going to disagree with each other, and I think that's exactly what they're supposed to be doing." The trial court then drafted a response to the jurors, charging them to rely on their memories of the evidence in reaching a verdict, and instructing them "to continue with

21

deliberations…in an attempt to reach a unanimous verdict," to which defendant objected. Shortly thereafter, the jury announced it had reached a unanimous verdict.

In defendant's written motion for a new trial, he asserts that the trial court erred in denying is motion for a mistrial. Defendant reiterates that the trial court's questioning of the holdout juror and charge to the jury to continue deliberations was prejudicial.

The issue concerning a motion for mistrial is governed by La. C.Cr.P. art. 775, which provides, in pertinent part that "upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771."

Defendant argues in his brief to this Court, as he argued in the motion for new trial, that the trial court erred in failing to grant a mistrial. He maintains that the decision to examine juror X and the foreperson, along with the charge to the jury to continue deliberating, constituted prejudicial coercion of juror X to change her vote. We disagree.

As stated above, both of the interviews with juror X were conducted at defendant's request. It should also be noted that defendant did not object at any point until he learned that the holdout juror was leaning toward voting not guilty. Only then did defendant object to the trial court's request for the jury to continue to deliberate. Defendant should not be permitted to request that the trial court take specific actions, then request a mistrial based on the court's acquiescence to those requests. *See State v. Shank*, 448 So.2d 654, 657-59 (La. 1984) ("One charged

22

with a crime cannot be permitted to subvert the ends of justice by his own intentional conduct.").

The Louisiana Supreme Court has held that the contemporaneous objection rule provides that "an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." *State v. Ruiz*, 06-1755, p. 8 (La. 4/11/07), 955 So.2d 81, 87 (citing La. C.Cr.P. art. 841(A); *State v. Knott*, 05-2252, p. 2 (La. 5/5/06), 928 So.2d 534, 535). It is well established that "[t]he contemporaneous objection rule has two purposes: (1) to put the trial judge on notice of the alleged irregularity so that he may cure the problem and (2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection." *State v. Thomas*, 427 So.2d 428, 433 (La. 1982).

During the court's second interview with juror X, she stated that she had been seeking more information "for the things that was making [her] lean to not guilty." While it is unknown why she was leaning toward a not guilty vote, but ultimately voted guilty, there is no evidence that the court's request to continue deliberations was the cause thereof. The allegation that the holdout juror was impermissibly coerced into changing her vote appears to be based on mere speculation, and the record does not demonstrate that the trial court abused its discretion in denying defendant's motion for a mistrial.

Defendant further argues that the trial court erred in obtaining the verdict by giving a prohibitive and coercive *Allen*[9] charge to the jury. An *Allen* charge refers to a charge given for the purpose of breaking a jury that is deadlocked. As this

_____

[9] *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (United States Supreme Court approved a charge to break a jury deadlock and accomplish jury unanimity).

23

Court has explained, "*Allen* charges are disfavored in Louisiana. In addition to the charge emphasizing that the jury has a duty to reach a verdict, implying that the trial judge will not accept a mistrial, that implied duty is often coupled with an admonition by the trial judge for those in the minority to rethink their position, creating pressure to conform to the majority's view." *State v Bell*, 15-1264, pp. 6-7 (La. App. 4 Cir. 7/6/16), 197 So3d 358, 362-3 (citing *State v. Collor*, 99-0175, p. 13 (La. App. 4 Cir. 4/26/00), 762 So.2d 96, 104).

In *Collor*, p. 13, 762 So.2d at 104, this Court discussed the *Allen* charge and the reasons it may be problematic, stating, "First, the charge emphasizes that the jury has a duty to reach a verdict, implying that the trial judge will not accept a mistrial. Second, when the duty to reach a verdict is coupled with an admonition by the trial judge that those in the minority should rethink their position, there exists an almost overwhelming pressure to conform to the majority's view."

The jury in *Collor* had only been deliberating for an hour when it announced it was deadlocked. The trial court asked if extra time would be helpful in reaching a verdict, and suggested that "there's always a possibility that some people might be able to be convinced." *Id.* This Court held that the trial judge did not abuse his discretion in asking the jury to continue deliberations, because the impermissible elements of the *Allen* charge were not present in that case, and in light of gravity of the offense and the fact that the jury had only deliberated for an hour. *Id.* at p. 15, 762 So.2d at 105.

In the present case, both parties submit that the jury had deliberated for just over two hours before it asked to review the evidence and revealed that its vote was stalled at eleven-to-one. It does not appear from the context of the transcript that the jury was hopelessly deadlocked, but rather, was seeking information that

24

could be helpful in continuing its deliberations. When giving the jurors the initial charges, the trial court instructed the jurors to reach their own verdict "by reason of his or her own appreciation of the law and evidence of the case." He encouraged them to "fully discuss" and "explore" the evidence and arrive at a verdict "which squares with his or her conscience, . . . and not to surrender it simply because he or she is outnumbered by other jurors entertaining a contrary opinion, or for any other reason not connected with the case." The trial court further instructed that a juror may change his or her opinion if fellow jurors are able to convince him or her that the initial opinion held does not conform to the law or evidence, "as long as the changed opinion squares with his or her conscience and oath." Additionally, the trial court stated several times that it would be willing to declare a mistrial should the jury indicate its inability to reach a unanimous verdict, which did not happen at any time in this case. Nothing in the trial court's subsequent instructions or statements to the jury indicated that he would not accept a mistrial if warranted.

Defendant states in his appeal brief that from the initial question sent down by the jury, the trial court wanted to give a "dynamite" *Allen* charge. The record does not support such an assertion. As previously explained, when the jury first sent a note asking to see the evidence and stating that they were stalled at eleven to one, the trial court explained the available options. All parties, including the defendant, agreed to ask the jury to continue deliberating.

After the second interview with juror X, wherein she made assurances that she did not know anyone involved in the case, the trial court again asked the jury to continue deliberating. At that time, the trial court again expressed a willingness to declare a mistrial if, in fact, the jury could not reach a unanimous verdict.

The record does not demonstrate that the trial court gave an impermissible *Allen* charge. Moreover, as in *Collor*, we find that in light of the seriousness of the charges against defendant and considering the short amount of time spent deliberating, the trial court did not err by asking the jury to continue deliberating. We find no merit in this assignment of error.

***Assignment of Error No. 3.***

In his final assignment of error, defendant asserts that his sentences of forty years on the charge of sexual battery, with twenty-five years served without the benefit of parole, probation, or suspended sentence, and twenty-five years on the charge of indecent behavior with a juvenile, served without the benefit of parole, probation, or suspended sentence, served concurrently, are excessive. In support of the argument that the sentences are excessive, defendant maintains that the trial court failed to consider the mitigating factors listed in La. C.Cr.P. art. 894.1.

At the outset, we must determine whether defendant preserved this issue for appeal. As this Court held in *Summers*, 10-0341, p. 11, 52 So.3d at 958, "[i]t is well-settled that the failure either to file a motion to reconsider sentence or to object to the sentence at the time it is imposed precludes a defendant from raising a claim regarding his sentence on appeal."[10] *See also, State v. Zepeda* 17-0598, p. 12 (La. App. 4 Cir. 12/13/17), 234 So.3d 985, 992 (citations omitted).

---

[10] (citing *State v. Duncan*, 08-1579, p. 12 (La. App. 4 Cir. 6/17/09), 15 So.3d 1171, 1178; *State v. Alexander*, 06-1274, p. 10 (La. App. 4 Cir. 5/16/07), 958 So.2d 1203, 1208; *State v. Batiste,* 06-0875, p. 9 (La. App. 4 Cir. 12/20/06), 947 So.2d 810, 815; *State v. Clay*, 05-1467, p. 9 (La. App. 4 Cir. 10/4/06), 942 So.2d 563, 568-9; *State v. Hulbert*, 03-1149 (La. App. 4 Cir. 8/20/03), 852 So.2d 1245, 1246-47; *State v. Rodriguez*, 00-0519, p. 9 (La. App. 4 Cir. 2/14/01), 781 So.2d 640, 649; *State v. Tyler*, 98-1667 (La. App. 4 Cir. 11/24/99), 749 So.2d 767, 775; *State v. Robinson*, 98-1606, p. 9 (La. App. 4 Cir. 8/11/99), 744 So.2d 119, 125; *State v. Martin*, 97-0319, p. 1 (La. App. 4 Cir. 10/1/97), 700 So.2d 1322, 1323; *State v. Green*, 93-1432, pp. 5-6 (La. App. 4 Cir. 4/17/96), 673 So.2d 262, 265; *State v. Salone*, 93-1635, p. 4 (La. App. 4 Cir. 12/28/94), 648 So.2d 494, 495-96).

Here, defendant did not file a motion to reconsider his sentences. However, upon sentencing, defendant made an immediate motion for appeal. Because it is unclear from the record whether defendant objected to the sentences at that time, out of an abundance of caution, we will review the sentences for constitutional excessiveness.

The standard for reviewing excessive sentence claims has been set forth as follows:

> La. Const. art. I, § 20 explicitly prohibit excessive sentences. *State v. Baxley*, 94-2982, p. 4 (La. 5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. *State v. Francis*, 96-2389, pp. 6-7 (La. App. 4 Cir. 4/15/98), 715 So.2d 457, 461. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. *Baxley, supra*. A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. *State v. Johnson*, 97-1906, pp. 6-7 (La. 3/4/98), 709 So.2d 672, 676. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *Baxley*, 94-2982 at p. 10, 656 So.2d at 979.
>
> As articulated in *State v. Stanfield*, 2010-0854, p. 6-7 (La. App. 4 Cir. 1/19/11), 56 So.3d 428, 430, in reviewing a claim that a sentence is excessive the appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La. C. Cr. Proc. art. 894.1, and whether the sentence is warranted under the facts established by the record. *State v. Trepagnier*, 97-2427, p. 11 (La. App. 4 Cir. 9/15/99), 744 So.2d 181, 189. If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. *State v. Bonicard*, 98-0665, p. 3 (La. App. 4 Cir. 8/4/99), 752 So.2d 184, 185. *Id*., 2013-1262, pp. 16-17, 146 So.3d at 884;

*State v. Green,* 16-0793, pp. 9-10 (La. App. 4 Cir. 5/3/17), 220 So.3d 103, 109

(quoting *State v. Celestain*, 13-1262, pp. 16-17 (La. App. 4 Cir. 7/30/14), 146

So.3d 874, 884).

As this Court explained in *State v. Theophile*, 19-0467, pp. 14-15 (La. App.

4 Cir. 12/11/19), 287 So.3d 53, 63,

> "The trial judge is vested with broad discretion in sentencing, because the trial court is in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Wilson*, 2001-2815, pp. 3-4 (La. 11/22/02), 836 So. 2d 2, 4 (citing *State v. Cook,* 1995-2784 (La. 5/31/96), 674 So.2d 957). Thus, on appellate review of a sentence, the only relevant question is ' "whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." ' *Cook*, 1995-2784 at p. 3, 674 So.2d at 959 (quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)). ' "For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes punishment disproportionate to the offense." ' *State v. Soraparu*, 97-1027 (La. 10/13/97), 703 So. 2d 608 (quoting *State v. Sepulvado*, 367 So.2d 762, 767 (La. 1979)).

In the present case, defendant asserts that the trial court failed to consider

any mitigating factors listed in La. C.Cr.P. art. 894.1 or in the presentencing report

prior to imposing the sentences. Defendant maintains that he has no prior

convictions for sexual offenses and that the offenses charged in the instant case did

not allege the use of weapons, threats, or physical injury, thus his sentences should

be vacated as excessive and remanded to the district court for reconsideration.

As this Court discussed in *State v. Dauzart*, 11-0688, p. 13 (La. App. 4 Cir.

3/21/12), 89 So.3d 1214, 1222-23,

> The trial judge's failure to comply with La. Code Crim. Proc. article 894.1 does not automatically render a sentence invalid. The Louisiana Supreme Court has held that although Article 894.1 provides useful guidelines for the determination of the nature and length of a sentence, compliance with its provisions is not an end in itself. *State v. Wimberly*, 414 So.2d 666 (La. 1982). Article 894.1 is intended to provide an impartial set of guidelines within which the

> trial judge's sentencing discretion may be exercised. *State v. Price*, 403 So.2d 660 (La. 1981); *State v. Douglas*, 389 So.2d 1263 (La. 1980). Compliance with La. C.Cr.P. art. 894.1 further provides a record which is detailed enough to allow for a reasoned review of allegedly excessive sentences. The articulation of the factual basis for a sentence is the goal of article 894.1, not rigid or mechanical compliance with its provisions. A remand is unnecessary where the record clearly shows an adequate factual basis for the sentence imposed, even where there has not been full compliance with article 894.1. *State v. Boatright*, 406 So.2d 163 (La. 1981).

*Id.*

While the record demonstrates that the trial court failed to list the factors it considered in imposing sentences under La. C.Cr.P. art. 894.1, it is evident that consideration was given to the presentencing report and the victim impact statements. The trial court also explained the serious nature of the charges to defendant prior to trial, stating that the maximum sentence he could receive was ninety-nine years, and that while he may not receive the maximum sentence allowable, that "this is serious, serious, if he's found guilty."

As noted in defendant's competency evaluation report, which was presented to the trial court prior to trial, defendant admitted that he had "been locked up ninety-eight percent of [his] life." He listed a litany of offenses for which he had been either charged or convicted which he described as "way worse than [the instant charges]," and which included several counts of battery, theft and burglary, terroristic threats, and criminal sexual conduct, among others. Thus, the record reflects a serious criminal history and propensity toward violence and sexual criminal offenses, of which the trial court would have been aware.

Additionally, at the conclusion of the trial testimony, defense counsel informed the trial court that the state offered defendant a plea deal for a guilty plea to indecent behavior with a juvenile in exchange for a ten-year sentence, which

29

defendant rejected. During that colloquy, defense counsel explained that the federal government was investigating child pornography charges against defendant in another jurisdiction, and that it may elect not to prosecute if defendant were convicted on the instant sexual abuse charges.

The penalty for conviction of sexual battery on a victim under thirteen years of age when the offender is seventeen or older is imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years, with at least twenty-five years served without the benefit of parole, probation, or suspended sentence. La. R.S. 14:43.1(C)(2). The penalty for conviction of indecent behavior with juveniles when the victim is under the age of thirteen and the offender is seventeen or older is imprisonment at hard labor for not less than two years and not more than twenty-five years, with at least two years served without the benefit of parole, probation, or suspended sentence. La. R.S. 14:81(H)(2). In this case, the sentences imposed are within the sentencing guidelines; were imposed to run concurrently; and reflect that defendant earned credit for time served.

On its face, defendant's sentence of forty years for sexual battery, twenty-five of which must be served without benefits, is less than half of the maximum sentence of ninety-nine years provided for by statute. Because the sentence imposed for the conviction for indecent behavior with a juvenile is to run concurrently, that it is also for twenty-five years imprisonment at hard labor without benefits, though it is the maximum allowable sentence provided for by statute, does not expose defendant to any more punishment than he would otherwise serve under his sentence for sexual battery.

Moreover, one of the factors provided for consideration in sentencing under La. C.Cr.P. art. 894.1 is whether the offender "knew or should have known that the

victim of the offense was particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability, or ill health." Here, L.N. was only six years old at the time of the offense, which would have been obvious to defendant. She also suffered from multiple developmental disorders, including a speech impediment, which also would have been apparent to defendant. Once defendant pulled L.N.'s pants down, he also would have discovered that she was still wearing a diaper, which, at her age, should also suggest a developmental disorder.

Considering L.N.'s tender age and delayed development, the extremely long list of defendant's previous criminal conduct, including sexual offenses, and including the recent federal allegations of child pornography, defendant appears to pose a continuous risk to society and has not demonstrated any ability to rehabilitate his behavior. Thus, based on the record before us, we find that the sentences imposed were not excessive. This assignment of error is meritless even if it had been preserved for review.

For the foregoing reasons, we find no merit in any of defendant's assignments of error. Accordingly, we affirm the convictions and sentences.

**CONVICTIONS AND SENTENCES AFFIRMED**